## Cyrus Davidson, Appellee, v. Montgomery Ward & Co., Appellant.

### Gen. No. 16,916.

1. SPECIAL INTERROGATORIES—*when refusal not reversible error.* An Appellate Court will not reverse the judgment of the court below because of its refusal to give special interrogatories, where if such interrogatories had been given and answered in favor of the party propounding them they would not have controlled the general verdict because of the fact that such interrogatories did not reach all the good counts in the declaration supported by evidence.

2. SPECIAL INTERROGATORIES—*when trial court need not submit.* The trial court is not required to submit special interrogatories unless they relate to ultimate facts of such character as to control a general verdict.

3. NEGLIGENCE—*when manufacturer liable to third person for injuries sustained, because of defects in construction of machinery.* A firm holding itself out to be the manufacturer of certain saw frames and representing the same to be perfect, safe and thoroughly tested is liable for injuries sustained by an employe of the purchaser of such saw frames by the explosion of a balance wheel which was improperly cast, resulting in a weakened and porous condition.

4. DAMAGES—*when not shown to be excessive.* The mere fact that the income on the damages awarded by a jury in a personal injury case would be more than twice the earning capacity of the plaintiff at the time of the injury does not show that such verdict is excessive, as the mental and physical suffering, the crippled condition of the plaintiff and the fact that his earning capacity might have increased are all elements to be considered in estimating damages.

Appeal from the Superior Court of Cook county; the Hon. B. W. POPE, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Opinion filed June 14, 1912.

GEORGE P. MERRICK, for appellant.

EDWARD J. GREEN and CHARLES C. SPENCER, for appellee.

MR. PRESIDING JUSTICE BALDWIN delivered the opinion of the court.

This is an appeal from a judgment of the Superior Court of Cook county, Illinois, on a verdict for $35,000, in favor of appellee, for personal injuries. Plaintiff was employed by one Borden on his farm near Tonti, Illinois. He was a carpenter by trade and, on the farm, had charge of engines and other appliances in grinding grain, sawing wood, running windmills, etc., and of repairing machinery. One Dr. Johnson was also employed on the farm as superintendent. Appellee and Johnson examined a catalogue, issued by appellant, in which there was a description of a saw frame including a balance wheel. Subsequently Johnson ordered for his employer from appellant one of the kind there shown. Not having the implement in stock, appellant filled the order by directing the Sycamore Foundry Company, manufacturers of it, to send one direct to Borden, where it was set up by appellee, who began to saw wood with it. After the machine had been running an hour or two, its balance wheel burst and appellee was very seriously injured. He made a settlement with his employer, Borden, by which he received an annuity, and gave back a covenant not to sue, and then brought this action against appellant. During its brief service, before the accident, the saw was run by a gasoline engine which had been previously used by appellee to run a similar saw at various times during the preceding eighteen months. After the accident it was found that along the lines of the break the balance wheel was rough and filled with pores, and upon the trial it was referred to as "in a honey-combed condition, having, along the line of break, numerous pores that came to the surface, resulting in the defective part appearing like a sponge." These alleged defects, however, had been covered over and filled with black paint, concealing them. Two holes had also been bored in the rim, for the purpose of balancing the wheel. The break began

at these holes and passed through the parts where the pores were thickest and largest.

The declaration consisted of five counts, the last of which was withdrawn by appellee at the close of his evidence.

The first count charged that appellant was the manufacturer of the machine in question; that the balance wheel was so negligently made that it contained flaws and defects and that it was unsafe for the purpose for which it was sold, and that such condition was known to the appellant, or would have been known if it had used due care in that behalf; that the balance wheel, before it was sold, was covered with paint so that its defects were hidden and unknown to appellee; that appellant sold the saw frame, including the balance wheel, to Borden to be used by him and his servants, including the appellee, on Borden's farm in sawing wood; that while appellee, as such servant and employe of Borden, was operating said wood saw, and in the exercise of due care, by reason of said flaws in said balance wheel, due to the negligence of appellant, the balance wheel burst and appellee was injured.

The second, third and fourth counts alleged that at and before the time of the sale of the wood saw frame, appellant falsely held out and represented to Borden and his servants and his employes, including appellee, and the public in general, that the saw frame, including the balance wheel, was made of good material, and was of the best construction, and would do the work for which it was intended; aver that said balance wheel was not made of good material—was not of the best construction, and would not do the work for which it was intended, but, on the contrary, was made of poor, unsuitable material, contained flaws and defects, and was honeycombed, weak, insecure and unsafe for doing the work for which it was intended and made, and for the purpose for which it was sold by appellant to Borden, and the balance wheel was likely to explode

and burst when used; that after it was so manufactured and before it was sold to Borden by appellant, it was covered by paint so that the flaws and defects were hidden and concealed from sight, and were wholly unknown to appellee; and that the appellant negligently, carelessly and wrongfully sold said wood saw frame, including said balance wheel, to Borden to be used by him and his servants, including appellee, upon his farm in sawing wood.

In addition, the second count contained the following allegation: ''That the said balance wheel was made of poor and unsuitable material—contained flaws and defects, and was honey-combed, weak, insecure and unsafe for doing the work for which it was intended and made, and for the purpose for which it was sold by appellant to Borden, and that it was likely to explode and burst when used for such purpose, *was then and there known to appellant, or would have been known had it exercised due care in that behalf.*''

The fourth count contained the additional averment that the saw was made by a financially irresponsible and insolvent person, firm or corporation, whose name was unknown to appellee, and that said person, firm or corporation was guilty of negligence and carelessness in the manufacture of the balance wheel, and that appellant purchased said wood saw from said person, firm or corporation, and represented that it was made of good material and of the best construction, knowing that said manufacturer was financially irresponsible and insolvent.

Appellant pleaded the general issue, together with notice that it would introduce evidence that it did not manufacture the wood saw, or any part thereof. At the close of the testimony, appellant made separate motions, accompanied with appropriate instructions, directing the jury to find the appellant not guilty under the first, second, third and fourth counts, respectively, each of which said motions were denied, and the instructions tendered therewith refused.

At the trial appellant submitted two special interrogatories, and requested the court to submit each of them to the jury, viz:

1.   Was the defendant the manufacturer of the balance wheel in question?

2.   Did the defendant know at any time before the accident of any defect in the balance wheel?

These the court declined to submit, stating that he did not think that either of them related to an ultimate fact in the case.   No instructions were tendered by appellee, but, upon motion of appellant, the court gave to the jury sixteen instructions, numbered 1, 4, 7, 9, 11, 12, 14, 15, 16, 17, 18, 19, 20, 22, 24 and 25; the court then modified and gave nine additional instructions tendered by appellant, numbered 2, 3, 5, 6, 8, 10, 13, 21 and 23; and refused instructions numbered 26 to 34, inclusive, tendered by it.

Various grounds of alleged error are assigned and argued in the voluminous briefs of counsel in the case. It is contended that the court erred in refusing to submit to the jury the special interrogatories; that the verdict was grossly excessive; that the court erred in its rulings upon evidence, and in modifying certain instructions, and refusing others, tendered by appellant; that improper remarks were made during the trial by counsel for appellee, and broadly that the pleadings and proofs were entirely insufficient to establish any liability against appellant.

It is strongly urged by appellant that the court below committed reversible error in refusing to submit to the jury the two interrogatories which it tendered.   It is claimed that these interrogatories embodied two ultimate facts, each involving the liability of appellant—both of which were alleged in the declaration and sought to be sustained by evidence tendered at the trial.   Appellant claims that, had the interrogatories been pronounced, the jury must have answered each of them "No," and that such answers would

have been available in its behalf, and compelled the
trial court to set aside the general verdict against it;
and that, in any event, the statute gave appellant
the right to have the interrogatories submitted, and
answered one way or the other, and that it was fatal
error for the court to refuse to give them: The case
of Chicago City Ry. Co. v. Bucholz, 90 Ill. App. 440,
is cited in support of this contention. The decision
in that case is not in harmony with the subsequent de-
cisions of the Supreme Court of Illinois, and is not,
therefore, an authority in the case at bar.

Section 79, Chap. 110, Hurd's R. S., 1909, provides
that:

"In all trials by jury in civil proceedings in this
state, in courts of record, the jury may render, in
their discretion, either a general or a special verdict;
and in any case in which they render a general verdict,
they may be required by the court, and must be so re-
quired on request of any party to the action, to find
specially upon any material question or questions of
fact which shall be stated to them in writing. * * *
Submitting, or refusing to submit a question of fact to
the jury when requested by a party, as above pro-
vided, may be excepted to and be reviewed on appeal
or writ of error, as a ruling on a question of law.
When the special finding of fact is inconsistent with
the general verdict, the former shall control the latter
and the court may render judgment accordingly."

The first count of the declaration averred that ap-
pellant was the manufacturer of the alleged defective
balance wheel, and the second count charged that the
balance wheel was defective, insecure and unsafe, and
likely to explode and burst when used for the purpose
for which it was sold, and that this fact was then and
there known to appellant, or "would have been known
to it had it used due care in that behalf."

If we were to decide this question upon first impres-
sions, we might have felt constrained to sustain the

contention of appellant, and reverse the judgment of the court below because of its refusal to submit these two interrogatories; but, a careful examination of the question and of the decisions in this state compels us to reach a different conclusion. We are of the opinion that an Appellate Court is not justified in reversing the judgment of the court below because of its refusal to give special interrogatories, unless it appears that, if such interrogatories had been given and answered in favor of the party propounding them, they would of necessity control a general verdict not in harmony therewith, and make it the clear duty of the court to ignore such general verdict. All presumptions are in favor of a general verdict, and such a verdict will not be disturbed, unless the special findings upon the whole case are inconsistent therewith.

The trial court is not required to submit special interrogatories unless they relate to ultimate facts of such a character that they would control a general verdict. C. & A. R. R. Co. v. Harrington, 192 Ill. 9; Ballah v. Peoria Life Association, 159 Ill. App. 222; Frick v. Aurora, E. & C. Ry. Co. 154 Ill. App. 277; Devine v. Federal Insurance Co., 250 Ill. 203. If an answer favorable to the party propounding the interrogatory would reach only one count of a declaration, and there are other good counts supported by evidence, it is not reversible error to refuse such interrogatory. Unless, therefore, we can say that a negative answer to each of these two interrogatories would have required the ignoring of the verdict against appellant, the refusal to submit them to the jury cannot be held reversible error. Upon a careful examination of the pleadings and evidence, we have reached the conclusion that negative answers to both of these interrogatories would not have been inconsistent with the general verdict rendered.

In the case at bar, appellant's alleged liability is based upon the theory that the balance wheel in ques-

tion was manufactured by appellant either by itself, or by the Sycamore Foundry Company acting for it. But it is also contended that whether or not appellant were held to be the manufacturer, in any event, it sold the machine in question, having represented through its catalogues that it was perfect—had been tested—and was adapted to the uses for which it was intended; while, in fact, the wheel was not perfect, had not been adequately tested, and was not safe when applied to the use for which it was constructed, which condition was known to appellant, or would have been known to it had it used due care in that behalf. It would not answer this theory of the case, therefore, even if the jury found that appellant did not actually know of the defective condition of the wheel, if it were, in fact, defective, and if, by the exercise of due care, appellant would have known that fact.

Appellant contends that there was no privity between appellee and itself, and, therefore, no duty owing by it to appellee by reason of the alleged negligent construction of the machine in question sold to appellee's employer; that appellee being a stranger to the transaction would have no right of action upon a contract of warranty as to the quality of the machine sold; that even if appellant were the manufacturer of the machine in question, it was one eminently dangerous to human life, and, therefore, in the absence of actual knowledge of its defective condition, appellant would not be liable for injuries to appellee, who was only an employe of the purchaser; that appellant considered as a contractor, manufacturer or vendor could not be liable, because having no contractual relations with appellee, appellant would not be liable to him even though there was negligence in the construction, manufacture or sale of the machine in question.

There is no authority in this state, so far as we are advised, directly covering a case such as is made by

this record, although cases may be found elsewhere tending to support the contention of both parties.

As to the facts, appellant claims that it was a mere vendor, selling the machine to the employer of appellee and not to the appellee himself; that there was no actual reliance on any representations made by it; that appellant did not make the machine nor insure its safety; did not know about or see the particular machine, and, therefore, could not have known that it was in any way defective; that appellant used no means to defraud or deceive; that the machine was made by a reputable manufacturer and was sold to appellee's employer upon the representation that it was fit for the purpose for which it was intended if properly operated in conformity with printed instructions in the catalogue, which were seen and read by appellee; that there was no guarantee as to the safety of the machine, and no warranty that its operation, skillful or otherwise, would not produce injury—no fraud, circumvention, concealment or artifice was practiced by appellant—but full opportunity for inspection and trial.

The English case of Winterbottom v. Wright, 10 Mees & W. 107, is one of the earliest and leading cases in this class of cases holding that an action could not be sustained where there was lack of privity. The case is often cited in many subsequent decisions and in numerous text books. In the Winterbottom case, the defendant contracted with the Postmaster General to furnish and keep in repair a mail coach; by reason of defendant's negligence the coach broke down and injured the driver. It was held that the driver could not maintain an action for the injury, there being no privity of contract between him and the defendant. Following the Winterbottom case, appellant's brief cites and quotes extensively from quite a large number of cases in different jurisdictions, all with more or less relevancy tending to sustain its contentions.

In the Third Edition of Cooley on Torts, page 1486, it is laid down as a general proposition that, "It is a general rule that a contractor, manufacturer, vendor, or furnisher of an article is not liable to third parties who have no contractual relations with him, for negligence in the construction, manufacture, or sale of such an article."

We have carefully examined the cases cited by appellant, with reference to the particular facts in each, but extended comment upon them would expand this opinion beyond any reasonable length. This general rule, that a contractor, manufacturer or vendor is not liable to third parties who have no contractual relations with him, concededly has three important exceptions: 1. Where the act of negligence of a manufacturer or vendor is with reference to some article imminently dangerous to the life or health of human kind; such as that of a dealer in drugs who sold to another druggist a jar of belladonna and labeled it "Extract of Dandelion." The second druggist filled a physician's prescription for extract of dandelion from this jar. The patient took the medicine supplied upon this prescription, and an action by him was sustained against the first seller of the drugs. Thomas v. Winchester, 6 N. Y. 397. 2. Where an owner's act of negligence, which causes an injury to one invited upon the owner's premises, as where the owner of a building employed a contractor to construct a cornice and agreed to furnish a scaffold upon which the contractor's men should do the work; the scaffold was furnished by the owner, and an action by an employe of the contractor was sustained. Coughtry v. Globe Woolen Co., 56 N. Y. 124. 3. Where one, without giving notice of its qualities, sells or delivers an article which he knows to be imminently dangerous to life and limb, in which case he becomes liable to any person who suffers an injury therefrom, which might have been reasonably anticipated, regardless of any con-

tractual relations between the parties—as where a dealer sold a gun to a father for the use of himself and his sons, representing it to be safe and made by a good manufacturer—but it was not made by that manufacturer, and was defective, and, when discharged by one of the sons, it exploded and injured him, and the dealer was held liable. Landridge v. Levy, 2 Mees & W. 519.

It is contended, however, that appellant is liable: (a) because it made false representations concerning the machine sold; (b) that appellant was liable to appellee, though a stranger to the contract of sale, because it induced the sale of an implement recognized as dangerous, by false representations as to its quality, having sold the machine in question either with actual knowledge of its dangerous defects, or with constructive knowledge, being chargeable with the knowledge of the Sycamore Foundry Co.; (c) that appellant being the owner of the machine in question, having made representations concerning it, is bound to know whether those representations were true; (d) that appellant is liable as a manufacturer of the machine, first, because the Sycamore Foundry Company made the machine for it, upon its special order, and second, because appellant held itself out as the manufacturer; (e) that appellant is liable for having negligently sold on the market the machine in question, which was dangerous when used for the purpose for which it was intended, and its liability, therefore, extended to any person using it, regardless of contractual relations, and that appellant is estopped to deny its liability upon the ground of want of privity, because appellant induced the court below to give instructions stating a contrary doctrine.

It appears that the sale of the saw frame and balance wheel was made because of an inspection of one of appellant's catalogues then in the possession of appellee and his superintendent. In this catalogue there

was shown a picture of the machine, together with an extended description of it, including therein a reference to the balance wheel. This was followed by the statements, "We always ship right-hand frames unless otherwise ordered. Upper cut shows saw arranged for poles; lower cut for cordwood. * * * Ship from factory near Chicago or Southern Minnesota." The catalogue further contains the following statements: "You are safe, *perfectly safe*, in ordering. * * * Be sure and read this—our offers—our guarantee. * * * We know that when you buy an implement you do not want to be delayed or bothered to return it. * * * We know you want an even stronger assurance of quality than is a mere chance to return an article should it prove not to be what you expected; that is why we offer you only standard make, regular size, *thoroughly tested implements*, known to every one by years of reputation as the *best made*, and back them with our reputation and our liberal guarantee. * * * These facts, backed by our liberal guarantee, insure your satisfaction in every purchase. * * * Remember, we ship you the kind of tools you will not have to return—just such goods as you intend to buy. * * * All our implements are further guaranteed to do the work for which they are intended when correctly set up and properly operated. * * * Our implement manager has had a lifetime experience in this line. Prior to joining our organization, he was for a number of years manufacturing farm machinery. * * * We have four large warehouses filled with new tools. * * * Whenever we can do so satisfactorily and to the interests of our customers, we ship direct from the factory. This saves storage and handling expense, and enable us, in such case, to make a lower price. Do not understand for a minute that shipping from the factory means any delay. It does not, for the goods are all ready to ship before we

order them.  *  *  *  We manufacture, buy and sell direct to the farmers of America, as well as Africa, China, Russia, Japan, etc.  Every implement is guaranteed to be made of good material and to be just as described, to do the work for which it is intended, when correctly set up and properly operated.  *  *  * We have four large implement warehouses, which we keep filled with well-assorted stocks for quick shipments.  *  *  *  Also the arrangements with our factories are such as to provide for quick service.''

From an inspection of this catalogue, containing the phrases quoted and others of similar import, which was offered in evidence, we think it apparent that appellant held itself out as a manufacturer, and intended the public to so believe, and to act upon such belief, and accordingly it must be held to be charged with and to assume all the obligations and responsibilities of a manufacturer.  The machine in question was ordered from it as a result of an inspection of this catalogue, which appellee testified to having read and relied upon, believing its representations to be true, and, when the machine was delivered, it bore appellant's initials (M. W. & Co.), which might readily have been understood as indicating the manufacturer.  In any event, appellant made no attempt to disclose to appellee, or to others purchasing from it, any relation to the articles sold inconsistent with that of being the manufacturer.

Upon this record, we feel bound to hold that appellant is liable in this case if the appellee's injury was due to a dangerously defective condition of the balance wheel furnished as a part of the machine in question.  As to this there is, of course, a conflict in the testimony.  There is testimony tending to show that in material and workmanship, the wheel was properly constructed; that it had been tested at the factory, and that its bursting was due, not to any defect in the wheel itself, but to improper handling; that the

protection against the wheel's bursting lay in its rim; that the alleged weakness, the porous, sponge-like condition of the web of the wheel, in no manner contributed to the accident, but that the accident was due entirely to overspeeding the balance wheel. Appellant contends that the gasoline engine, by which the saw was operated, being of twelve to fifteen horsepower, was so powerful that when the saw was temporarily disengaged from the wood, it and the balance wheel would be at once enormously accelerated in speed before the regulator upon the engine could check its speed; that the wheel burst largely, if not entirely, because of this rapid and instantaneous acceleration, which was, of course, greatest at the rim. One of appellant's witnesses testified that an inspection was made of the wheel in question before it was shipped; that he struck the wheel lightly with a hammer while it was lying against the side of a room, and that he did not detect anything wrong.

On the other hand, it appears that the identical engine used in furnishing the power to the saw in question had been used without any mishap for a long time previously in operating a saw substantially like the one here involved; that the number of revolutions per minute at the time of the accident was within the limit fixed by experts as being entirely safe, had the balance wheel been perfect. There was testimony tending to show that a balance wheel like the one in question, if properly made of good material, could safely be revolved at from 1,500 to 1,800 revolutions per minute; but with such defects, however, as shown in the one in question, a wheel would be likely to burst if revolved at 1,100 revolutions per minute, which was approximately the speed at which the wheel was run at the time the accident occurred; that the regulator upon the engine did operate promptly and efficiently to prevent any considerable acceleration in speed; and that neither the saw nor the balance wheel were in any greater danger because of the fact that the en-

gine was of such horsepower rather than of less.   The testimony on behalf of appellee tended to show that if the balance wheel was ever tested at all, it was done in a very imperfect manner and one which was entirely unreliable, inadequate and unsafe, and that the holes and defects in the wheel, and its porous condition, were concealed from observation by being covered with a heavy coat of black paint.   Appellee testified that the "honey-combed" or spongy-like formation came to the surface, that it extended clear through the body of the wheel, only it was painted over with japan or heavy black paint, which made a smooth surface on the outside, but that, aside from the paint, this formation came clear to the surface.

Upon the whole evidence we do not feel justified in holding that the jury was wrong in finding that the accident occurred by reason of a defective and dangerous condition of the balance wheel.

We think the balance wheel in question, in its construction and use, and when sent out under such representations and warranties as were made by appellant in its catalogue, was such an instrument, as that, if it proved seriously defective and dangerous, and appellee was injured thereby, without fault on his part, appellant became responsible; that under the circumstances, appellant was bound to know that the balance wheel was safe for the use to which it was to be put.   We do not think it necessary that it should be established that the balance wheel was an instrumentality imminently dangerous in itself, but we think it sufficient to establish liability of appellant if the balance wheel in question was made of improper material, or improperly cast, resulting in such a porous and weakened condition that when put to the use for which it was bought and sold it was imminently perilous, and the wheel had been so imperfectly and inadequately tested as to not disclose this condition.   It was intended to be revolved at a high rate of speed on a wood

saw, around which men are necessarily engaged when it is in operation, and who cannot be protected by any known appliance against the frightful results which follow an explosion of a balance wheel.

Our view, that such conditions as are shown by this record would establish liability against appellant, is supported by the judgment of the Supreme Court of New Hampshire in 1908, in Cunningham v. C. R. Pease House F. Co., 74 N. H. 435. This was an action which was brought by a daughter to whose mother the representations were made. The plaintiff's evidence in the case tended to show that certain manufacturers of a stove blacking advertised it in Nashua, stating that it was for sale by the defendants; the plaintiff's mother saw the advertisement, called at the defendant's store and asked a clerk if the blacking they were advertising was intended for stovepipes or for stoves. He replied that it was intended for stoves, and said, "the warmer the stove, the better it works." She replied, "Won't that be fine; I can black my stove without letting my fire go out." Relying upon the representations that the blacking could be safely used on a hot stove, the mother bought a can. Two days later, the plaintiff, a member of her mother's family, used some of the blacking on a hot stove and an explosion resulted, causing the injuries complained of. The plaintiff and her mother were blamelessly ignorant of the fact that the blacking contained naphtha. In the opinion the court says:

"The defendant's position is like that of one who 'puts destructive * * * materials in situations where they are likely to produce mischief.' Ricker v. Freeman, 50 N. H. 420, 432. Such a person must respond in damages to those who are injured because of his acts, if he either knew or ought to have known that the materials were dangerous and that the persons injured might come in contact with them. Hobbs v. Company, *ante*, 116; Scott v. Shepherd, 3 Wils. 403; S. C. 2 W. Bl. 892; Cooley on Torts, 78.

"Although the defendants probably did not have the plaintiff in mind when they sold the blacking to her mother, they knew the mother bought it to use on her stove and that other members of the family were likely to use it, consequently the plaintiff can recover, if her mother could have recovered, had she been injured instead of the plaintiff. * * *

"The common law imposes upon the seller the duty to refrain from falsely representing material facts for the purpose of misleading the buyer. * * *

"If, therefore, the defendant's false representation that it was safe to use the blacking on a hot stove was the cause of the plaintiff's injury, the facts that they thought the statement was true, and had no intent to deceive, do not necessarily bar her right to a recovery. Proof of those facts would merely require her to prove facts not essential to her case if the representation was deceitfully made. If the representation was deceitful she could recover by showing that their fault contributed to cause her injury; but if it was merely negligent, she must show that it was the sole cause of her injury. 14 Harv. Law Rev. 188. The reason for this is, that the law makes it the duty of everyone to use ordinary care to avoid being injured by another's negligence; but it imposes on no one the duty to use such care to avoid being injured by another's intentionally wrongful act."

A judgment for plaintiff was affirmed. The Cunningham case is but one of a number similar in principle. It will not do to say that the liability in that case existed solely because of the fact that there was some naphtha in the stove polish in question, and that it thereby became a product imminently dangerous,—it became dangerous only when brought into contact with heat, and the purchaser bought it for that very use. In the case at bar, the balance wheel was not in itself imminently dangerous, except when revolving rapidly and serving the very purpose for which it was sold.

Vendors and manufacturers have been held liable for injuries to third persons because of dangerous defects in articles sold by them, which were falsely represented to be perfect and safe, or to have been carefully tested; among cases so holding are Kuelling v. Roderick Lean Mfg. Co., 183 N. Y. 78; Torgesen v. Schultz, 192 N. Y. 156; Allison v. Tyson, 5 Humph. (Tenn.) 489; Lewis v. Terry, 111 Cal. 39; Ward v. Fullman Co., 128 S. W. (Ky.) 606; Woodward v. Miller, 119 Ga. 618; Elliott v. Hall, L. R. 15, Q. B. D. 315; Statler v. Ray Mfg. Co., 195 N. Y. 478; Pierce v. C. H. Bidwell T. Co., 153 Mich. 323; Clement v. Crosby & Co., 148 Mich. 293; Schubert v. J. R. Clark Co., 49 Minn. 331; Holmvik v. Parsons Band Cutter Co., 98 Minn. 424; Wolcho v. Rosenbluth, 81 Conn. 358.

It is further contended that the damages awarded by the jury are excessive. At the time of the appellee's injury, he was twenty-seven years of age. He was then earning $50 per month. By a settlement with Borden, his employer, he had received an annuity of $360.00 per year for life. A safe rate of interest upon the amount of the verdict would produce more than twice the annual income he was earning when injured; that fact alone, however, is not controlling. There is no presumption that appellee would not have become more proficient in his ability to do, and therefore able to earn a much larger amount had he continued uninjured. His condition after the accident was exceedingly distressing. His right arm had to be removed at the shoulder; both bones of the left arm were broken; the physician testifies that there is very great atrophy of the muscles of the back, chest and shoulder, and of the left arm and hand and fingers, which are wasted away, the little finger and the one next to it are turned downward in a claw-shape; there is drooping of the lid of the right eye and reddening of its membrane, involving the eyesight; three operations upon his right shoulder were necessary; there is

evidence of two broken ribs and a dislocation of the collar bone; continual pain in the shoulder and back of the neck; loss of memory; unconsciousness for a considerable period after the accident; large expenses in physicians' and nurses' bills; necessity for continued assistance in eating and dressing; the prolonged physical and mental suffering which he has undergone as a result of the injury, and the conditions under which he will be compelled to spend the remainder of his life,—all these things make it difficult to say with any degree of definiteness exactly how much should be awarded for the injury. We cannot be unmindful of the fact that the money value of life and health is appreciating, and the earning capacity of money steadily diminishing during these recent years. Without deciding that the amount of the verdict is not larger than we would ourselves have made it, had the responsibility been ours, we do not think it so excessive as to require interference on our part.

We have examined the alleged errors of the court below in its rulings upon evidence and in respect to the instructions, and do not find any substantial error therein; nor do we think that appellant was injured by the alleged improper remarks made by counsel for appellee during the trial.

Finding no reversible error in this record, the judgment of the court below will be affirmed.

*Judgment affirmed.*