Vera Lill, Appellee, v. Murphy Door Bed Company of Chicago and Chicago Title and Trust Company.
Appeal of Murphy Door Bed Company of Chicago, Appellant.

Gen. No. 39,151.

Opinion filed May 19, 1937.

WENDELL H. SHANNER, of Chicago, for appellant; CHARLES V. LAUGHLIN, of Chicago, of counsel.

RYAN, SINNOTT & MILLER, of Chicago, for appellee.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from a judgment entered against the defendant Murphy Door Bed Company of Chicago, a corporation, in an action in case in the superior court on the verdict of a jury for the sum of $4,000 in favor of plaintiff Vera Lill.

The action was filed prior to the adoption of the Civil Practice Act and is not governed by same. The suit was originally brought by plaintiff, Vera Lill, against the Murphy Door Bed Company of Chicago, a corporation, and the Chicago Title and Trust Company, a corporation, as trustee under a certain deed of trust, to recover damages for personal injuries alleged to have been sustained by plaintiff when a bed in which she was lying is alleged to have broken and injured her.

At the close of plaintiff's case the trial court directed the jury to return a verdict of not guilty in favor of the defendant, Chicago Title and Trust Company. The case was submitted to the jury as to the defendant Murphy Door Bed Company of Chicago, against which company the verdict was returned.

A special demurrer to plaintiff's original declaration, consisting of two counts, was sustained. An amended declaration was filed which also consisted of two counts and upon which plaintiff proceeded to trial. The first count alleges that the plaintiff was a tenant in a building located at 535 Cornelia avenue, which was owned by the defendant Chicago Title and Trust Company, as trustee; that plaintiff's apartment was furnished with a bed, which was constructed and installed in such a manner that, when not in use, it could be secreted in a closet provided for that purpose; that the said bed was manufactured by defendant Murphy Door Bed Company of Chicago and by that company sold to the owner of the building; that Murphy Door Bed Company, in disregard of its duty, carelessly, negligently and wrongfully manufactured, sold and deliv-

ered the bed in a defective condition and, as a result of such defect, the bed broke while the plaintiff was using it and she thereby incurred the injuries of which she complains.

The second count of the amended declaration is substantially the same as the first count, except that it alleges more specifically that the defendant Murphy Door Bed Company of Chicago failed to inspect or test the said bed before selling and installing the same.

At the time of the trial, by leave of court, plaintiff was permitted to file two additional counts to her declaration and at that time the Chicago Title and Trust Company the other defendant had already been directed out of the case. The additional counts, therefore, declared only against the present defendant, Murphy Door Bed Company of Chicago, hereinafter referred to as defendant.

The two additional counts are substantially the same as the two original counts of the amended declaration, except that they do not allege that defendant manufactured the bed in question. They allege that the defendant sold and installed the bed and, held itself out to the public as the manufacturer.

The first additional count alleges that the defendant delivered and installed the bed in a defective condition, and in the second additional count that the defendant did not perform its duty to inspect and test the bed.

Defendant demurred to the additional counts, which demurrer was overruled. The court sustained the motions of the defendant Murphy Door Bed Company of Chicago for a directed verdict in its behalf, at the close of all the evidence, as to the first and second counts of the amended declaration, but denied similar motions as to the two additional counts. Consequently, the case was submitted to the jury only upon the two additional counts.

The second point on the pleadings is that after the court overruled the defendant's demurrer to the additional counts, the defendant filed two pleas: (1) A plea of the general issue and (2) a plea that the cause of action, if any, set out in the two additional counts was barred by the limitation period provided by our statutes. Plaintiff's demurrer to this plea was sustained and the ruling of the court is urged as error.

Plaintiff contends that the defendant sold the bed, which caused plaintiff's injury, to the owner of the building at 535 Cornelia avenue; that defendant held itself out to the public as the manufacturer of the bed because the word "Murphy" was engraved upon certain of the metal castings of the bed; that because of such representation or holding out, the defendant assumed the same liability toward plaintiff as though it had manufactured the bed; that the bed was defective, which defect was the result of careless and negligent manufacture and that the bed was not properly inspected and tested before being put upon the market; that the manufacturer knew of such defective condition or by the exercise of reasonable care could have known of it.

Plaintiff further contends that she was a tenant in the building located at 535 Cornelia avenue and occupied the particular apartment in which the bed which caused her injuries was located; that while in the exercise of due care for her own safety, she was lying on the bed preparatory to retiring for the night, that the U-shaped bar referred to broke, causing the bed to assume an abnormal position, and causing a hinged headpiece to swing over and strike her on the head, causing the injuries of which she complains.

Defendant contends that it owed no duty to the plaintiff to exercise any care whatsoever in the sale or installation of the bed in question because no privity of contract existed between plaintiff and defendant;

that it did not sell the bed to plaintiff but to the owner of the building in which plaintiff became a tenant; that the evidence does not establish the existence of any of the three exceptional situations in which a manufacturer or vendor of an article may owe a duty to exercise care to those with whom there is no privity of contract; that a bed is not an inherently dangerous instrumentality intended to preserve or destroy life; that defendant neither by implication or otherwise invited the plaintiff to make use of the bed in question; that the defect in the bed, if there was a defect, was not of such a nature as to render its use so imminently dangerous that injury was likely to result therefrom.

Defendant further contends that unless facts are proven which bring a case within the scope of one of these three situations, a manufacturer or vendor owes no duty to one, other than the purchaser, to carefully manufacture or to inspect the article sold; that as an additional alternative theory, even if it owed some duty to the plaintiff, the evidence does not show that it violated any such duty.

Defendant further contends that it was not a manufacturer of beds and did not manufacture the bed in question but only sold beds manufactured by the Simmons Bed Company; that the duty of a vendor is less than that of a manufacturer; that in regard to the argument of plaintiff that defendant held out to the public that it was the manufacturer of the bed, defendant contends in the alternative: (1) That even if it did cause it to appear that it manufactured the bed, that circumstance is legally immaterial; and (2) That the defendant did not represent to the public that it manufactured the bed in question, and that the presence of the word ''Murphy'' upon the metal casting of the bed did not constitute such a representation, but was consistent with the status of the defendant as a mere vendor.

Defendant further contends that the two additional counts to the plaintiff's amended declaration do not state a cause of action; that the court erred in sustaining the plaintiff's demurrer to its plea of the statute of limitations filed to those counts and that the court committed errors during the trial.

The evidence shows that the plaintiff Vera Lill was at the time of the trial 28 years of age and at the time of the accident was occupying a two-room apartment with her friend Myrtle Lenander at 535 Cornelia avenue; that plaintiff had leased the apartment from the Chicago Title & Trust Co., trustee, in which apartment the bed which caused plaintiff's injuries was installed. The bed was in the living room which was the largest room in the apartment which consisted of a living room, a kitchenette, a dressing room and a bath room. On the west wall of the living room was a large closet in which the bed was kept when not in use. There was a door to that closet which could be closed when the bed was placed therein. In order to put the bed into the closet the bed had to be in a vertical position and when one wished to let the bed down at night one would swing it around into the living room; that the bed was attached to the door jamb that it swung around on. There were two legs at the foot of the bed when the bed was in an upright position, the legs were parallel with the mattress, they folded down, and when the bed was in a horizontal position for use the legs were at right angles with the mattress and with the floor. They held the bed up. There was a headpiece on the bed which was of metal which weighed about 8 pounds and extended across the width of the bed and when the bed was in an upright position to be put away, that piece was parallel with the mattress. When the bed was lowered for use that piece was in an upright position and at a right angle to the bed. The bed was supported at the head by a U-shaped piece of

iron metal. The base castings of the bed did not rest on the floor as legs do, but were approximately an inch above the floor and carried the weight of the head end of the bed by being attached to the jamb frame, which was attached by the lower casting to the door jamb. The metal piece at the head of the bed was movable and was about 17 inches from the hinge to the top and about 53½ inches wide. The bed was 6 feet 3 inches in length and the permanent parts were all made of metal. To lower the bed for use it was necessary to swing it around on the door jamb and then pull it down and in lowering the bed, the frame of the bed operated on pivots on the base castings about a foot from the jamb frame. The headpiece at its lower ends was attached by hinges to certain metal posts which, together with the headpiece, formed the head of the bed. Attached to the rear of the upper horizontal bar of the headpiece was a helical spring which connected the top of the headpiece to the top of the so-called carrying frame or jamb frame. The pivot castings were inserted in the sockets which were attached to the jamb of the door and the weight of the bed was supported by the lower or base castings, one of which broke at the time of the accident and injured plaintiff.

The evidence further shows that on the night of the accident as plaintiff was preparing for bed the young woman who shared the apartment with her opened the door of the bed closet in the usual manner, swung the bed out into the living room and lowered it into a horizontal position with the legs of the bed resting on the floor; that after plaintiff got in bed and was about to lay her head on the pillow the head end of the bed dropped and plaintiff received a terrible blow on her head which rendered her unconscious. The U-shaped bar or base casting on the left side of the bed had suddenly broken, causing the bed to drop and the legs at the foot of the bed to fold under and the headpiece or

part of it to drop forward from its vertical position and strike the plaintiff.

Counsel for plaintiff urges that the defendant Murphy Door Bed Company had a bed manufactured for it which it held out to the public as its product and thereby the defendant assumed liability toward the plaintiff; that the bed was defective which defect was the result of the bed having been carelessly and negligently manufactured; that the manufacturer either knew of the defective condition, or with the exercise of due care could have known of this condition and had not properly inspected or tested the bed before putting it upon the market and the defendant because of its holding out to the public that it was the manufacturer was responsible for the manufacturer's negligence and is liable as though it had manufactured the bed.

Plaintiff testified that on the night of the accident the bed had been lowered into a horizontal position by Miss Lenander, the other occupant of the apartment, and that as she, the plaintiff, went to bed she sat on the edge of the bed for a minute or two and then swung her legs up on the bed and started to lean back; that as she did so she felt the head end of the bed just drop slightly and then that she felt a terrible blow on her head and that is all she remembered; that at the time of the accident she weighed 118 pounds and that as she got into bed she did not jump in, but just sat down quietly.

Plaintiff further testified that prior to the accident she indulged in athletics, played golf frequently and enjoyed swimming; that she danced and did a lot of walking and that her health was very good; that after the accident when she regained consciousness her head hurt terribly and that she was very dizzy and nauseated and the next day her head ached worse than it did just after the accident; that she did not return to her employment until about a month after the accident and

then she would go down late in the morning and come home early, a few hours each day; that she was not paid for the time she was not working; that after she started to work steadily she still had headaches and dizzy spells and found it difficult to concentrate upon her work and at the end of the day she felt terrible; that she was nervous and finally had to resign in February, 1933; that she did not go back to work again until August, 1933; that at the time of the trial she still complained of headaches and dizzy spells.

Myrtle Lenander Colcaire, the other young woman who shared the apartment with plaintiff, testified that on the night of the accident she lowered the bed into the living room in the usual manner and while she was in the bathroom she heard a crash and rushed back into the living room and found the plaintiff "all crouched" in a heap on the bed; that plaintiff's head was on the bed covers and the bed clothes were covered with blood and plaintiff appeared to be unconscious and she tried to arouse her; that she then telephoned the Belmont Hotel and asked them to send over the house doctor; that she also telephoned the manager of the building in which they lived; that the doctor came and sewed up the wounds in plaintiff's head.

The witness Colcaire further testified that after the accident she noticed that the bed was out of position; that the spring was loosened from the head board and it had become disengaged from the other mechanical apparatus on which the bed swung and that the legs of the bed had folded and that the U-shaped bar had become disjointed and broken; that she talked with Mr. Howard, the manager of the building, and he pointed out where the pipe had broken that the paint had run through the crack on the metal on the inside of the pipe; that the pipe she referred to was a solid iron bar.

Dr. A. B. Rimmerman, called in behalf of plaintiff, testified that he had been practicing medicine and sur-

gery for the past 23 years and that on or about September 19, 1932, he received an emergency call and found the plaintiff lying in bed in a pool of blood and unconscious; that he tried to stop the bleeding from the scalp and head which was from the posterior lateral near the back and side of the body; that he sewed up plaintiff's head and examined for any possibility or probable fracture or paralysis, pupil examination, etc., and waited until she became conscious; that he diagnosed her condition as concussion of the brain, laceration of the scalp, possible fracture; that he later had X-ray pictures taken of her head; that the X-ray pictures did not show any pathological condition of the skull; that he attended her every day for 10 days and thereafter about 2 or 3 times a week, gradually decreasing the number of visits; that she was under his care from September, 1932, to March, 1933; that during that time she made complaints of headaches and dizziness, especially on exertion of work, she was melancholy, and nervous; that a concussion of the brain is a shaking up of the brain and that hemorrhages scatter throughout the surface of the brain; that she was unable to work but for a few hours at a time and that he advised complete rest until she had fully recovered; that he made a charge for his services of $150.

Joseph A. Borque, called as a witness on behalf of plaintiff, testified that he lived at 535 Cornelia avenue, Chicago; that he was the engineer of the building in which plaintiff lived at the time of the accident; that the day after the accident the bed was taken to the service hall and that he examined it and that the casting appeared to be defective; that he took the casting part for the photographer and the examination was made under a high light; that it had the appearance of a burned piece of iron, it looked more like a sand hole. It looked to be 40 to 60 per cent defective.

George Hildebrand, called as a witness on behalf of defendant, testified that he was assistant manager for the Murphy Door Bed Company and had been employed by them for 13 years. He identified plaintiff's Exhibits 2 and 3, being a catalogue and literature issued by the Murphy Door Bed Co. of Chicago. This literature was issued by the defendant and declares them to be the makers of this bed. After stating that the bed is sturdy and offers all that one could ask in sleeping comfort, it states, "The makers of this bed offer you more than the bed itself; they place at your disposal the accumulated experience of architects and builders in the successful inclusion of the Murphy In-A-Dor Bed in every type of building from tiny love nest bungalows to towering hotels."

At another place in the literature issued by the defendant, it is stated: "All castings of the Murphy In-A-Dor Bed are malleable iron—iron that does not break."

As to the contention of the defendant that the statute of limitations should have been sustained as to the amended declaration, we think that under section 39 of the Practice Act of 1907, as amended in 1929, the court did not err in permitting the additional counts filed and plaintiff was not barred by the statute of limitations. These counts did not state a new cause of action, but were in the nature of an amendment to correspond with the proof. *Skala v. Lehon,* 343 Ill. 602; *Zister v. Pollack,* 262 Ill. App. 170.

As to defendant's liability, we do not think there is any difference between the liability of a manufacturer and one who holds himself out to be a manufacturer.

In the case of *Davidson v. Montgomery Ward & Co.,* 171 Ill. App. 355, the situation presented is very similar to the case at bar. In that case a person was injured by a saw which was not manufactured by the person who sold it and the question there discussed was

whether there is a distinction as to the liability of an actual manufacturer or one who holds itself out to be a manufacturer. There, as here, the appellant claimed himself to be a mere vendor. The catalogue from which the saw was ordered contained the following statement: ''You are safe, *perfectly safe,* in ordering . . . that is why we offer you only standard make, regular size, *thoroughly tested implements,* known to every one by years of reputation as the *best made.*''

. In the case at bar the defendant held itself out to be the manufacturer of the bed by which the plaintiff was injured. The bed was represented by the defendant to be safe, that the castings were made of ''malleable iron—iron that does not break.'' As a matter of fact the piece of iron which broke at the time plaintiff sustained the injuries complained of was defective as the exhibit before us plainly shows as the paint which was put on the casting ran into the cracked portion and could have been easily detected by a proper test or inspection.

Again in the case of *Davidson v. Montgomery Ward & Co.,* 171 Ill. App. 355, the court quoting from the case of *Cunningham v. C. R. Pease House F. Co.,* 74 N. H. 435, after citing the case of *Ricker v. Freeman,* 50 N. H. 420, said: ''Such a person must respond in damages to those who are injured because of his acts, if he either knew or ought to have known that the materials were dangerous and that the persons injured might come in contact with them. . . .

''Vendors and manufacturers have been held liable for injuries to third persons because of dangerous defects in articles sold by them, which were falsely represented to be perfect and safe, or to have been carefully tested; . . .''

Defendant further contends that it is not liable for the reason that there was no privity of contract be-

tween the injured person and the defendant. That is true as a general rule, but, in the case of *Colbert v. Holland Furnace Co.,* 333 Ill. 78, the court at page 81, said: "The rule, however, has several exceptions, and the question to be here determined is whether, under the facts as shown by the evidence in this case, it comes within any of such exceptions. One of the well recognized exceptions to the rule is, that one who supplies a thing for such use by others that it is obvious that any defect will be likely to result in injury to those so using it is liable to any person who, using it properly for the purpose for which it is supplied, is injured by its defective condition. (29 Cyc. 484; *Hayes v. Philadelphia Coal Co.,* 150 Mass. 457; *Devlin v. Smith,* 89 N. Y. 470; *Connors v. Great Northern Elevator Co.,* 90 N. Y. App. Div. 311; . . . The doctrine of invitation has been invoked as a ground of liability in such cases, proceeding upon the theory that he who furnishes a thing for a certain use by others invites others to use it, and is therefore bound to make it safe for such purpose. This rule is consonant with reason and justice and is not inconsistent with any of the decisions of this court, and is especially applicable to the facts of the instant case. . . . The law is presumed to furnish a remedy for every wrong. The defective condition was hidden from ordinary observation and was a latent defect of which the owner, who accepted the work, would not be chargeable with knowledge of its defective construction. We are of the opinion that the facts in this case bring it clearly within the exception to the rule above stated, and that justice requires that plaintiff in error should compensate defendant in error for the injuries which she has sustained by reason of the defective installation of the grating over the cold air shaft." *Wintersteen v. National Cooperage & Woodenware Co.,* 361 Ill. 95.

We think the rule in this State is that when an article is constructed by a manufacturer for others and, by reason of negligence, uses defective material or fails to use ordinary care in testing and inspecting the article after it is manufactured and before it is put into use and by reason thereof persons using the same are likely or liable to be injured, such manufacturer or one who holds himself out to be the manufacturer is liable to such person who suffers injury, through such negligence, while using such article in a proper manner. This is true even though there be no privity of contract between the manufacturer and such persons.

The length of time before the defect in the construction became known would not, in our opinion, preclude the plaintiff from her right to recover damages for the injuries sustained, because when the accident did occur it was the result of the negligence of the defendant in failing to properly test said bed before its sale and discover the defective casting. *Siegel, Cooper & Co. v. Trcka,* 218 Ill. 559, 564; *Pierce v. C. H. Bidwell Thresher Co.,* 153 Mich. 323.

It is claimed by the defendant, appellant here, that the jury was improperly instructed and counsel particularly criticizes the giving of plaintiff's instruction 11 referring the jury to the declaration. The defendant is scarcely in a position to criticize this instruction and the action of the court in giving it, for the reason that in a peremptory instruction, given at the behest of the defendant, the defendant used practically the same language. It is a well-known rule that a party cannot be heard to criticize an error if a like error appears in instructions submitted by him. In the case of *Lerette v. Director General of Railroads,* 306 Ill. 348, the court said:

"It is contended that the court erred in giving certain instructions at the request of appellee which re-

ferred the jury to the declaration to determine the issues. This form of instruction has been repeatedly condemned by this court. (*Krieger v. Aurora, Elgin & Chicago Railroad Co.*, 242 Ill. 544; *Laughlin v. Hopkinson*, 292 id. 80.) But appellant is in no position to urge the question in this case, for the reason that the same error is found in many instructions given at the request of the defendants below. *McInturff v. Insurance Co. of North America*, 248 Ill. 92; *Fleming v. Elgin, Joliet & Eastern Railway Co.*, 275 id. 486.''

It is next claimed by defendant that error was committed by the court in permitting the invoice, under which the bed involved in this accident was sold to the building, to be introduced in evidence, as the guarantee or contract on the back of said invoice might mislead the jury and cause them to believe that the cause of action was based on said guarantee which by its terms had expired. While we think it would have been better to have deleted this part of the invoice and avoided any possibility of error, yet we do not believe the error was sufficiently grave to justify a reversal of the judgment.

It is next contended that the damages are excessive. The plaintiff was a young woman of 25 years of age at the time of the accident. On the night of the accident she was just about to retire for the night and just as she was about to place her head upon the pillow she received a terrific blow on the back and left side of her head, as a result of a casting on the bed breaking which caused a movable headpiece on the metal bed to strike her, rendering her unconscious. Plaintiff's scalp was lacerated and when the doctor arrived he took two deep sutures and four skin sutures to close the wound. She remained unconscious for approximately a half hour. The doctor diagnosed the injury as concussion of the brain, laceration of the scalp and possible fracture. Subsequently it was found that the

skull was not fractured. The doctor treated her daily for 10 days. After recovering consciousness she was in severe pain, dizzy and nauseated for a week thereafter and at the time of the trial still complained of her health, as the result of her injuries, and the doctor prescribed the use of a physiotherapy lamp, infra red lamp, sedatives for headaches and medicines for nervousness.

Prior to the accident plaintiff had a responsible position from which she derived a salary of $130 per month. A month after the accident she started back to work, working short hours, arriving at work late in the mornings and leaving early in the afternoons, but she suffered from headaches, nervousness and dizzy spells and at night was troubled with nightmares and loss of sleep and she was finally compelled to resign from her position and was unable to do any further work until the following August. At the time of the trial which was nearly two and a half years after the accident she still complained of headaches and dizzy spells, which occurred sometimes three or four days a week.

We do not think the evidence shows that the damages allowed by the jury are excessive. The awarding of damages is peculiarly within the province of the jury and unless the court is convinced that they are excessive, it will not alter the verdict.

In *Chicago & Alton R. Co. v. Fisher,* 38 Ill. App. 33, 43:

"In Sutherland on Damages, Vol. 1, p. 810, it is said: 'When there is not a legal measure of damages, and when the damages are unliquidated, and the suit is referred to the discretion of the jury, the court will not, ordinarily, interfere with the verdict. It is the peculiar province of the jury in such cases, under appropriate instructions from the court, to decide such cases, and the law does not recognize in the court the

power to substitute its own judgment for that of its jury.' "

As before stated we are not impressed with the claim that the amount of the verdict of $4,000 is excessive, considering the pain and suffering, the loss of salary and expense plaintiff incurred as a result of her injuries.

We do not find any error in these proceedings which would justify a reversal and for the reasons herein given, the judgment of the superior court is affirmed.

*Judgment affirmed.*

HEBEL and HALL, JJ., concur.