(No. 55877.—■■■■■■■■■■■■)

ROHN HEBEL, Appellee, v. SHERMAN EQUIPMENT, Appellant.

*Opinion filed October 22, 1982.*

Wildman, Harrold, Allen & Dixon, of Chicago (Howard T. Brinton, William J. Rogers, and Ruth E. Van Demark, of counsel), for appellant.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (James W. Ford, of counsel), for appellee.

JUSTICE CLARK delivered the opinion of the court:

In this products liability action, summary judgment for the defendant, Sherman Equipment (Sherman), was entered by the circuit court of Cook County. A divided appellate court reversed. (100 Ill. App. 3d 1054.) We granted Sherman's petition for leave to appeal, and we now reverse the appellate court.

The following is a summary of the salient facts. On February 22, 1976, plaintiff, Rohn Hebel, then 16 years old, was working at the Glenbrook Standard Service Station and Car Wash in Northbrook when his foot was caught in the car conveyor and mangled by the conveyor's drive chain. Hebel's amended complaint, alleging that the "car washing machine" at the Glenbrook Standard Station had been designed, manufactured and sold by Sherman and that it was in a defective and unreasonably dangerous condition, was filed on July 31, 1978.

The Glenbrook Standard Station purchased its car-washing equipment in 1971 from Haverberg Auto Laundry Equipment Company in Chicago. Haverberg (which

is sometimes referred to in the pleadings by its trade name, Flapan Car Wash Equipment Company) is primarily engaged in selling, installing and servicing automatic car-washing equipment, but it also manufactures some car-washing equipment itself. Haverberg is a distributor for Sherman Industries, Inc. (the actual corporate name of Sherman Equipment), a New Jersey–based manufacturer of automatic car-washing machinery. Apart from the conveyor, nearly all of the equipment purchased by Glenbrook from Haverberg was manufactured by Sherman. This included a large washer, shaped like an inverted "U," with enormous brushes, of the kind commonly seen at a tunnel-type car wash, as well as a similarly shaped rinser, dryer, and "wax actuator." Each of these machines prominently displayed Sherman's trade name and rather distinctive logo ("Sherman Supersonic Systems, Palmyra, N.J."). The conveyor—an 80-foot-long track with rollers that emerge from beneath the floor to push automobiles along under the various washing and rinsing units—bore no identifying name or serial number. Hebel admits in his brief that the conveyor was designed and manufactured by Haverberg, not by Sherman.

Sherman moved for summary judgment in the circuit court on the ground that it did not manufacture, design or sell the allegedly defective conveyor that injured the plaintiff. It supported the motion with the affidavits of employees of Sherman and Haverberg stating that Haverberg, not Sherman, designed and manufactured the conveyor. Hebel's response to the motion asserted that Sherman "had held itself out to be the manufacturer of the automatic car washing system" at the Glenbrook Standard Station, including the defective conveyor which was a "component of the system," and that Sherman was therefore liable as though it were the actual manufacturer. The appellate court, in reversing the sum-

mary judgment, found that a factual issue existed as to whether Sherman held itself out as the manufacturer of the conveyor, apparently on the basis of evidence from which the court thought it could be inferred that Sherman had authorized Haverberg's use of its name in advertising the conveyor. 100 Ill. App. 3d 1054, 1059-60.

Decision of this case requires us first to examine the "holding out" or "apparent manufacturer" doctrine. The imposition of tort liability based on a defendant's status as the "apparent manufacturer" of a harm-causing product predates by some years the advent of the doctrine of strict liability in tort of suppliers of unreasonably unsafe chattels. The rule evolved in cases in which a retailer or distributor of a product manufactured by another was found to have held itself out to the public as the product's manufacturer, and therefore to be subject to the same liability as the actual manufacturer. (2 Hursh & Bailey, American Law of Products Liability sec. 7:2 (2d ed. 1974), and cases there cited.) The rationale for imposing liability on the apparent manufacturer was a species of estoppel: the vendor who, through its labeling or advertising of a product, caused the public to believe that it was the manufacturer and to buy the product in reliance on the vendor's reputation and care in making it, was held to have assumed the obligations of a manufacturer and to be estopped to deny its identity as the manufacturer. (*Davidson v. Montgomery Ward & Co.* (1912), 171 Ill. App. 355, 367, 369; *Burkhardt v. Armour & Co.* (1932), 115 Conn. 249, 264-65, 161 A. 385, 391.) The Restatement (Second) of Torts formulation of the rule states: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." (Restatement (Second) of Torts sec. 400 (1965).) According to the Restatement comment: "The actor puts out a chattel as his own product in two types of cases. The first is where

the actor appears to be the manufacturer of the chattel. The second is where the chattel appears to have been made particularly for the actor. In the first type of case the actor frequently causes the chattel to be used in reliance upon his care in making it; in the second, he frequently causes the chattel to be used in reliance upon a belief that he has required it to be made properly for him and that the actor's reputation is an assurance to the user of the quality of the product. \*\*\* Thus, one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark. When such identification is referred to on the label as an indication of the quality or wholesomeness of the chattel, there is an added emphasis that the user can rely upon the reputation of the person so identified." (Restatement (Second) of Torts sec. 400, comment *d* (1965).) Another justification sometimes given for the rule is that where a defendant puts out a product as its own, the purchaser has no means of ascertaining the identity of the true manufacturer, and it is thus fair to impose liability on the party whose actions effectively conceal the true manufacturer's identity. *Burkhardt v. Armour & Co.* (1932), 115 Conn. 249, 264-65, 161 A. 385, 391; *Dudley Sports Co. v. Schmitt* (1972), 151 Ind. App. 217, 224-25, 279 N.E.2d 266, 273.

"Holding out" cases usually involve either (a) a defendant's labeling or affixing to the product its own name, trade name, or trademark; or (b) advertising identifying the defendant as the maker of the product. Representative examples are: *Lill v. Murphy Door Bed Co.* (1937), 290 Ill. App. 328 (defendant sold the "Murphy In-A-Dor Bed" to building owner, who installed it in plaintiff's apartment; bed was made by Simmons Company, but defendant's name was engraved on bed's metal castings; further, defendant's catalog and brochures declared that it was the maker of the bed, that the bed was

sturdy and the castings were of "iron that does not break"; defendant was liable for negligence in manufacture, leading to plaintiff's injury when bed frame broke); *Davidson v. Montgomery Ward & Co.* (1912), 171 Ill. App. 355 (plaintiff was injured when balance wheel on wood-saw frame, ordered from defendant's catalog, burst; catalog stated that defendant was a manufacturer, that implements were shipped directly from the factory, and that all implements were "thoroughly tested" and known by defendant's reputation to be "the best made"; saw frame also bore defendant's initials, and there was no indication that frame had been made by another; held, defendant intended public to believe it was manufacturer of the saw frame and to act on such belief, and therefore held to assume all obligations and responsibilities of a manufacturer); *Sears, Roebuck & Co. v. Morris* (1961), 273 Ala. 218, 136 So. 2d 883 (retailer which sold a boat trailer under its trade name "Elgin" had a manufacturer's liability for injury when metal wheel disintegrated as plaintiff was inflating tire); *Burckhardt v. Armour & Co.* (1932), 115 Conn. 249, 161 A. 385 (plaintiff sustained injury resulting in death from jagged piece of tin in canned corned beef; product had been packed by Argentine corporation under agreement with defendant distributor; legend on label, "Armour Veribest Products," was exclusive trademark of defendant, and label did not identify actual packer, so that reasonable purchaser would infer that defendant was packer; defendant, by selling product under its own name, held to have put it out as its own). See cases cited 2 Hursh & Bailey, American Law of Products Liability sec. 7:2 (2d ed. 1974); Annot., 51 A.L.R.3d 1344, 1361-63 (1973).

It is noteworthy that the apparent-manufacturer doctrine was developed in the context of suits by consumers against sellers of dangerous chattels. Nearly all the cases imposing liability on this basis involve defendants who

were retailers or distributors. The aim of the doctrine clearly was to provide a remedy for consumers injured by unsafe products. Today, of course, this objective is achieved by the doctrine of strict products liability; all sellers of dangerously defective chattels are now strictly liable to injured purchasers—that is, they have the same liability as the manufacturer—without regard to whether or not they held themselves out to the public as the maker of the product. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339.) The function of the apparent-manufacturer doctrine has, as it were, been absorbed by the theory of sellers' strict liability in tort for injuries caused by unreasonably unsafe products.

Two questions thus arise: first, whether anything remains of the apparent-manufacturer rule; and, second, whether the rule applies to a defendant who, like Sherman, neither manufactured nor sold the product that injured the plaintiff. The doctrine, as noted above, was fashioned with reference to sellers; we have found only two cases in which it was applied to a nonseller. (*Rubbo v. Hughes Provision Co.* (1941), 138 Ohio St. 178, 34 N.E.2d 202; *Gizzi v. Texaco, Inc.* (3d Cir. 1971), 437 F.2d 308; see 2 Hursh & Bailey, American Law of Products Liability sec. 11:4, at 500-01 (2d ed. 1974).) Even if we assume, however, that the apparent-manufacturer doctrine is properly applicable to Sherman, we find that the pleadings, depositions, affidavits and other materials introduced on the motion for summary judgment, considered in the light most favorable to the plaintiff, fail to reveal facts that amount to Sherman's holding itself out to the public as the manufacturer of Haverberg's conveyor.

It is undisputed that the greater part of the car-washing equipment in use at the Glenbrook Standard Station was manufactured by Sherman and was labeled with Sherman's name and logo, and that the allegedly defec-

tive conveyor, manufactured by Haverberg, bore no identifying insignia. The appellate court found that the reasonable person in plaintiff's position would view the entire assemblage at the Glenbrook car wash as one "system" and would infer that Sherman manufactured all of its "component parts," including the conveyor, and that this inference amounts to Sherman's holding itself out as the conveyor's manufacturer. We think that this belief, reasonable or not, has no bearing on the issue. The primary rationale for imposing liability on the apparent manufacturer of a defective product is that it has induced the *purchasing public* to believe that it is the actual manufacturer, and to act on this belief—that is, to *purchase the product in reliance* on the apparent manufacturer's reputation and skill in making it. (Restatement (Second) of Torts sec. 400, comment *d* (1965); *Davidson v. Montgomery Ward & Co.* (1912), 171 Ill. App. 355, 367; *Carney v. Sears, Roebuck & Co.* (4th Cir. 1962), 309 F.2d 300, 304-05 (Virginia law).) It is thus apparent that whether a holding out has occurred must be judged from the viewpoint of the purchasing public, and in light of circumstances as of the time of purchase. It is clear, and plaintiff does not seriously dispute, that the various car-washing machines made by Sherman, as well as the conveyor made by Haverberg, were individual pieces of equipment which were purchased and sold as separate items, and apparently also were operated independently of one another. That a casual observer, viewing the machines after their purchase and installation, might think otherwise does not mean that a reasonable purchaser of car-washing equipment, such as Glenbrook, would rely on such an impression. This is not a case in which the defendant manufactures and sells a single machine that contains a defective component part not manufactured by it (compare *Penn v. Inferno Manufacturing Corp.* (La. App. 1967), 199 So. 2d 210 (defendant, manufac-

turer of fluid level gauge, had manufacturer's liability for injuries caused by explosion of sight glass; though sight glass manufactured by another, defendant held itself out as manufacturer by labeling gauge with its name and also labeling box in which separate glasses were shipped, and failing to indicate that glass had been manufactured by another)). The mere fact that Sherman's machines, which bore its name, were sold by Haverberg and used by Glenbrook in conjunction with a separate, unlabeled piece of equipment does not, we think, identify Sherman in the mind of the reasonable purchaser as the maker of the unlabeled machine, or render Sherman liable for injuries caused by it under the apparent-manufacturer rule.

We next consider plaintiff's contention that the use of Sherman's name on a promotional flyer, issued by Haverberg, advertising the conveyor amounted to Sherman's holding itself out as manufacturer of the conveyor.

Sherman prepared and issued a number of flyers advertising the equipment it made. Each of these one-page flyers describes one of its car-washing machines. On the front, each flyer has a photograph of the unit, on which the Sherman Supersonic Systems logo is clearly visible, with the name and model number of the unit at the top of the page. Text on both sides describes the machine's features and specifications. The name Sherman Car Wash Equipment Company (which was Sherman's official name prior to 1976), the name Sherman Industries, Inc., the Sherman Supersonic Systems logo, and Sherman's New Jersey address and phone number appear in large type at the bottom of each side of the page.

The brochure on which plaintiff seeks to base liability was prepared by Haverberg. At the top of one side in large type is printed ''Jack Flapan's HAVERBERG Equipment Company''; the name ''Haverberg'' is on a separate line and is in print larger than the other word-

ing. The reverse has text extolling the conveyor and describing its features. On both sides of the flyer appear two photos of the conveyor track and mechanism with no designation on the conveyor as to its manufacturer. At the bottom of the side of the sheet with the text is the single word "Sherman," followed on the next line by the name "Haverberg Auto Laundry Equipment Company, Inc." and Haverberg's Chicago address and phone number. As discussed above, a defendant that advertises itself as the maker of a product may be found to have held itself out to the public as the manufacturer, if the advertising was such as to lead a reasonable purchaser to believe that the defendant, and not some other party, was the actual manufacturer. (*Burkhardt v. Armour & Co.* (1932), 115 Conn. 249, 264-65, 161 A. 385, 391; *Carney v. Sears, Roebuck & Co.* (4th Cir. 1962), 309 F.2d 300, 304-05.) We doubt, in the first place, whether Haverberg's flyer would mislead the reasonable purchaser of car-washing machinery as to the identity of the manufacturer. Its identification of Sherman was weak at best, and it also clearly identified Haverberg, the true manufacturer. (Plaintiff does not argue that Glenbrook was misled; the Glenbrook-Haverberg contract for sale of the car-washing equipment lists, as the first of 12 items, "1 Haverberg 80' hookless on demand conveyor with 26 dollies triple track.") More important, however, is the fact that the flyer was undisputedly prepared by Haverberg, not by Sherman. We have found no case in which a defendant was held to have a manufacturer's liability based on *another party's* representations in its advertising that defendant was the manufacturer.

The plaintiff argues, however, that Sherman should be liable if found to have authorized Haverberg's use of its name in promoting sales of its conveyor. Plaintiff relies primarily on *Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393. In *Connelly*, this court considered the issue

of the liability of a licensor (Uniroyal) for injuries caused by a defective tire bearing the Uniroyal trademark which had been manufactured by the licensee—a Belgian corporation indirectly controlled by Uniroyal—under a licensing agreement pursuant to which Uniroyal provided the licensee with the plans, specifications and other technical know-how needed to produce the tires, authorized the licensee's use of the Uniroyal name and trademark in advertising, and in consideration received quarterly payments from the licensee. The court held that Uniroyal was strictly liable in tort, although it had neither manufactured nor sold the tire that injured the plaintiff.

The basis for the imposition of strict liability in *Connelly* was the defendant's integral involvement in the overall producing and marketing enterprise that placed the dangerous product in the stream of commerce, and its participation in the profits from the distribution of the product. (75 Ill. 2d 393, 411.) This "enterprise theory" of liability has been recognized in a growing number of decisions dealing with trademark licensing and franchising agreements. (Sandrock, *Tort Liability of a Non-Manufacturing Franchisor for Acts of its Franchisee*, 48 U. Cin. L. Rev. 699 (1979).) One factor leading to the imposition of strict tort liability on the nonmanufacturing trademark owner in these cases is that the licensee's use of the trademark in advertising the product creates the public impression that the licensor is the actual maker and induces consumers to rely on the appearance that the trademark owner is responsible for the product and stands behind it. (*Kosters v. Seven-Up Co.* (6th Cir. 1979), 595 F.2d 347, 353 (Michigan law).) However, the inducement of consumer reliance is not the only consideration in imposing strict liability. Rather, the decisions emphasize that liability arises from the same combination of considerations that underlie the doctrine of strict products liability generally: that the loss caused by un-

safe products should be borne by those who create the risk of harm by participating in the manufacture, marketing and distribution of unsafe products; who derive economic benefit from placing them in the stream of commerce; and who are in a position to eliminate the unsafe character of the product and prevent the loss. (*Connelly v. Uniroyal* (1979), 75 Ill. 2d 393, 411; *Kosters v. Seven-Up Co.* (6th Cir. 1979), 595 F.2d 347, 353.) As stated in the seminal case of *Kasel v. Remington Arms, Inc.* (1972), 24 Cal. App. 3d 711, 101 Cal. Rptr. 314, strict liability arises, not because of the defendant's legal relationship with the manufacturer or with other entities in the manufacturing-marketing system, but because of its "participatory connection, for [its] personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product." 24 Cal. App. 3d 711, 725, 101 Cal. Rptr. 314, 323. The instant case does not come within the rule of *Connelly*. Comparing the facts of the two cases, it is evident that the circumstances that persuaded us that Uniroyal should be responsible for defective products manufactured by its licensee are absent here. Uniroyal specifically authorized its licensee to place the Uniroyal trademark, strongly identified with Uniroyal, on its tires and to use it in promoting sales—actions calculated to produce the impression in the purchaser's mind that the tires were a Uniroyal product. Uniroyal set up the arrangement and received both direct payments and indirect economic benefits from it. Haverberg, by contrast, did not place the "Sherman Supersonic Systems" trade name or logo on its conveyor or its promotional material but made what might almost be called incidental use of the name "Sherman" in conjunction with its own name—perhaps with some thought of suggesting its business relationship with Sherman, or trading a little on Sherman's business

goodwill. There was no evidence to suggest that Sherman authorized or permitted Haverberg to place its name on the flyer. While it might well be possible to find, even in the absence of a formal, written agreement, that a defendant had authorized another party to use its name or trademark, there was no evidence here of even an informal understanding between Sherman and Haverberg as to Haverberg's advertising of Haverberg's products. Sherman did not receive payment from Haverberg for the use of its name, or any part of Haverberg's profit from the sales of the conveyor. In short, we do not find that Sherman had the kind of participatory connection with the enterprise that produced and marketed the conveyor, or the economic benefit from placing it in the stream of commerce, that led to the imposition of strict liability in *Connelly*. While that opinion did state that a defendant's participation in the chain of distribution was not an essential element for strict liability to apply (75 Ill. 2d 393, 410-11), the reference was to the fact that a defendant such as Uniroyal who is not in the direct chain of sale leading from manufacturer to consumer may nonetheless be so integrally involved in the overall producing and marketing enterprise that strict liability will follow.

For the foregoing reasons, the judgment of the appellate court is reversed, and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*