cide whether jeopardy attached when the Declaration of Forfeiture issued.

■ Jones argues that he made a claim to the property and became a party to the forfeiture proceeding. The Court does not agree. There are certain rules described above which apply when a person wishes to become a party to an administrative forfeiture proceeding. A person must overcome such procedural hurdles to contest the forfeiture. Indeed, the person who fails to perfect his claim, just as one who chooses not to contest the forfeiture, is never in jeopardy because one cannot be in jeopardy without being subject to the risk of an adjudication of guilt or innocence. *Serfass*, 420 U.S. at 391–92, 95 S.Ct. at 1064. Therefore, because Jones did not fulfill the procedural requirements and subject himself to a proceeding where his guilt or innocence might be determined, he was never in jeopardy and cannot prevail on his claim that his subsequent conviction violated the Double Jeopardy Clause. *See United States v. Unger*, 898 F.Supp. 740, (D.Or. 1995) (finding that an administrative forfeiture did not implicate the Double Jeopardy Clause when the party filed a claim and posted the requisite bond but failed to file a claim and answer in the civil forfeiture case initiated upon referral of the administrative proceeding to the Office of the United States Attorney); *United States v. Muth*, 896 F.Supp. 196 (D.Or.1995) (finding that an administrative forfeiture did not implicate the Double Jeopardy Clause when the party's request to proceed in forma pauperis with his claim was denied for unsatisfactory proof and the party failed to perfect his claim by posting the bond or taking further action.)

Apparently, Jones sought no further relief following the denial of his request to proceed in forma pauperis; for example, there is no evidence that Jones sought to amend his request to supply adequate documentation. The Court additionally notes that it has reviewed the claim and the declaration Jones filed in support of his request to proceed in forma pauperis. (Mov.Reply to Gov.Resp.Attachs.) In his declaration dated February 26, 1991, Jones asserted that he was employed but had not worked for over a month since DEA seized his truck on January 7, 1991; he also claimed to have received during the past twelve months $106,307.83 in salary plus $9,564.00 in retirement benefits from the United States Army. He stated that he had an overdrawn checking account and supported his wife and son. As for property owned, Jones cited the seized truck as worth $50,000 and a 1990 Chrysler Imperial with a "$14,000 balance owed." The declaration included no attached documentation. The Court assumes that the required bond would have been $5,000. With a yearly income of over $110,000 and no additional information or documentation explaining why Jones was unable to post the demanded bond, the Court finds that Jones' Declaration in Support of his Request to Proceed in Forma Pauperis was inadequately supported and did not prove Jones' financial inability to post the bond. 19 C.F.R. § 162.47(e). Accordingly,

**IT IS HEREBY ORDERED** that the motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 of Charles Boston Jones is denied.

**Regina M. YODER and Lester L. Yoder, Plaintiffs,**

v.

**HONEYWELL INC. and Bull Information Systems Inc., formerly known as Honeywell Information Systems Inc., Defendants.**

Civ. A. 94–B–1256.

United States District Court, D. Colorado.

Oct. 10, 1995.

242

Richard M. Foster, Cockrell, Quinn & Creighton, Denver, CO, Marc P. Weingarten, Greitzer and Locks, Philadelphia, P.A, Steven J. Phillips, Levy Phillips & Koenigsberg, New York City, for plaintiffs.

Robert J. Potrykus, Giovanni M. Ruscitti, Popham, Haik, Schnobrich & Kaufman, Ltd., Denver, CO, Russell S. Ponessa, Robert B. MacDonald, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, Bert L. Wolff, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendant Honeywell.

Daniel F. Warden, Michael L. Singer, Denver, CO, for Defendant Bull HN.

## AMENDED MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiffs Regina M. Yoder and Lester L. Yoder (the Yoders) bring this product liability action against defendants Honeywell Inc. (Honeywell) and Bull Information Systems Inc. (Bull) for injuries caused to Ms. Yoder from her use of an allegedly defective computer keyboard. Presently before me are Honeywell's motion for summary judgment and Bull's motion to dismiss. Honeywell asserts entitlement to judgment because it did not manufacture the keyboards at issue and it is not the "alter ego" of Bull, the manufacturer. Bull contends the Yoders' claim against it is barred by the applicable statute of limitations. The motions are fully briefed and orally argued. For the reason set forth in this order, I grant both motions.

### I.

The following facts are not genuinely disputed. This action was originally filed on December 29, 1992 in the Eastern District of New York as part of a multiple party litigation. On April 21, 1994 Honeywell moved for and was granted a transfer of venue to this district.

From May 1990 until November 1990 Ms. Yoder was diagnosed with or underwent surgery for the following conditions: bilateral radial tunnel syndrome, bilateral thoracic outlet syndrome, bilateral tendinitis of the upper extremities; corrective surgery for left carpal tunnel syndrome; and corrective surgery for right carpal tunnel syndrome. Complaint, ¶¶ 69–70. Ms. Yoder claims that she incurred these injuries while employed by United Airlines at Stapleton Airport in Denver as a result of her use of an allegedly defective, unsafe and unreasonably dangerous computer keyboard designed, manufactured, marketed and sold by Honeywell and/or Bull, including Honeywell Information Systems, Inc. (HIS).

At a Scheduling/Planning conference on August 17, 1994, Honeywell contested liability based on product identification. Both parties were present at an inspection of the subject keyboards on December 7, 1994. Charles L. Fauble conducted the inspection on behalf of Honeywell.

In support of its motion, Honeywell presents the affidavit of Charles L. Fauble (Fauble). Fauble has been employed in the keyboard manufacturing business since 1978. Fauble Aff., ¶ 1. He was employed by Honeywell from 1986 to 1993 as the director of engineering for its keyboard division. Fauble Aff., ¶ 2. On December 7, 1994 Fauble examined several of the keyboards at the United Airlines Reservation Center at Stapleton Airport where Ms. Yoder worked and disassembled three. Fauble Aff., ¶ 8. On July 19, 1995 Fauble examined another seven keyboards. Fauble Aff., ¶ 9.

None of the seven keyboards examined bore trademarks identifying the manufacturer on the front of the keyboard enclosures. Fauble Aff., ¶ 13. Each of the seven keyboards had labels bearing a trademark on the bottom of the keyboard enclosures. Fauble Aff., ¶ 14. Three of the keyboards bore the trademark name Incoterm and four bore the Honeywell trademark. Id. Based on Fauble's examination of the keyboards he determined that the keyboards were not manufactured by Honeywell. Fauble Aff., ¶ 10. Plaintiffs have made no showing that a genuine issue of fact exists that Honeywell manufactured, sold, or distributed any computer keyboard alleged to be defective.

Honeywell also submits the affidavit of its current secretary Sigurd Ueland, Jr. in sup-

port of its contention that it is not the alter ego of HIS. Ueland has served in an executive capacity for Honeywell since 1973. Ueland Aff., ¶ 3. He has served as corporate secretary for a number of Honeywell subsidiaries including HIS. Id.

HIS was formed in 1970 for the purpose of designing, developing, manufacturing and marketing a complete line of computers and computer-related services. Ueland Aff., ¶ 11. HIS was owned by General Electric and Honeywell from 1970 to 1977. In 1977, HIS became a wholly-owned subsidiary of Honeywell and remained so until 1987. Ueland Aff., ¶ 13. In 1987, Honeywell sold 57.5% of its interest in HIS to Compagnie des Machines Bull (Machines Bull), and NEC Corporation, who renamed HIS, Honeywell Bull Inc. (Honeywell Bull). Ueland Aff., ¶ 14. In 1988, Honeywell sold an additional 22.6% of its interest in Honeywell Bull to Machines Bull. Honeywell Bull was then renamed Bull HN Information Systems. Ueland Aff., ¶ 15. Honeywell sold its remaining interest in Bull to Groupe Bull, formerly Machines Bull, in 1991.

In 1969 Incoterm Corporation (Incoterm) was formed to design, develop, manufacture, market and service electronic data computer-related products and software. Ueland Aff., ¶ 17. Incoterm was merged with BWL Terminal Sales, Inc. a wholly owned subsidiary of Honeywell in 1977, which retained the name Incoterm. In 1979 Incoterm was merged into HIS. Ueland Aff., ¶ 21.

At all times HIS observed corporate formalities including annual shareholder meetings and regular board of director meetings evidenced by corporate minutes. Ueland Aff., ¶ 26. HIS maintained its own bank accounts and corporate offices. Ueland Aff. ¶ 28–29. In 1970 at its formation, HIS had assets in excess of $1.3 billion dollars and sales of $859 million. Ueland Aff., ¶ 30. Honeywell's sales to HIS from 1973 to 1985 were never more than 0.5% of Honeywell's total sales. For the same period, HIS's sales to Honeywell never exceeded 3.3% of sales. Ueland Aff., ¶ 35.

Until 1979 the board of directors of HIS and the board of directors of Honeywell consisted of the same individuals. Plaintiff's

Response Brief, Exh. E, Ueland Deposition (Ueland Depo.), p. 28–29. From 1979 to 1987, HIS's board of directors included the chief financial officer of Honeywell, the chief accounting officer of Honeywell, and the head operating person of the computer business at HIS. Ueland Depo., p. 29. None of the employees of Honeywell were employed by HIS. Ueland Aff., ¶ 36.

On March 26, 1987, Honeywell and HIS entered into a trademark license agreement. Pursuant to the terms of the agreement, HIS was granted the right to use the Honeywell trade name, service mark and trademark as part of its corporate name. Plaintiff's Response Brief, Exh. D., p. 1. In return, HIS agreed that all products produced by HIS which bore the Honeywell trademark would comply with quality control standards prescribed by Honeywell. Id., p. 6.

The Yoders argue that HIS was merely an instrumentality of Honeywell and, therefore, as HIS's alter ego, Honeywell is liable for Ms. Yoder's injuries. In the alternative, the Yoders assert that Honeywell is liable for Ms. Yoder's injuries even if it did not manufacture the subject keyboard because it was the apparent manufacturer. I disagree.

On February 3, 1995, Honeywell informed counsel for the Yoders that it believed that the products at issue were not manufactured by Honeywell but, instead, by Honeywell Information Systems, Inc. (HIS), now known as Bull Information Systems (Bull). On March 3, 1995, the Yoders moved to amend their complaint to add Bull as a party defendant. The motion was granted and the amended complaint was filed on March 15, 1995.

Bull then filed a motion to dismiss on April 17, 1995, contending that the complaint must be dismissed for failure to bring the action within the two year limitations period established by C.R.S. 13–80–106. I agree.

## II.

Summary judgment shall enter where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If a movant establishes entitlement to judgment as a matter of law given uncontrovert-

ed, operative facts contained in the documentary evidence, summary judgment will lie. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). The operative inquiry is whether, based on all the documents submitted, a reasonable trier of fact could find by a preponderance of evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mares,* 971 F.2d at 494. Summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Mares,* 971 F.2d at 494.

### III.

■■ "Because this is a suit based on diversity jurisdiction, we apply the law of the forum state, in this case Colorado." *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1262 (10th Cir.1989). Whether a parent corporation should be held liable for the acts of its subsidiary based on the "alter ego" doctrine is based on the analysis of the following factors:

> (1) the parent corporation owns all or majority of the capital stock of the subsidiary; (2) the parent and subsidiary corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed. *Id.* at 1262–1263.

■■ It is undisputed that Honeywell owned 100% of HIS stock from 1970 until 1987. This unity of interest, however, standing alone is insufficient to find that the personalities of the corporation and its subsidiary are not distinct. *Industrial Comm'n v. Lavach,* 165 Colo. 433, 439 P.2d 359, 361 (1968); See *Fink v. Montgomery Elevator Co.*, 161 Colo. 342, 421 P.2d 735, 739 (1966). The board of directors of HIS consisted wholly of members of the board of directors of Honeywell from 1970 until 1979. After 1979, two of the three members of HIS's board of directors were members of Honeywell's board of directors until 1987. The identity of directors has been held to be innocuous where, as here, there is no evidence that through the board the parent controlled the subsidiary. *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358, 1364 (10th Cir.1974). Although Honeywell was responsible for the incorporation of HIS, there is no evidence that HIS failed to maintain a separate corporate existence or that HIS was undercapitalized at its inception. Furthermore, the evidence presented shows that the sales between Honeywell and HIS never exceeded 10% of the total sales of either company.

"In order to hold [Honeywell] liable for [Bull/HIS alleged tortious conduct], [the Yoders] must prove the corporate entity was used to defeat public convenience, or to justify or protect wrong, fraud or crime." *Lowell Staats,* 878 F.2d at 1264–65. The Yoders have failed to present any evidence that Honeywell used HIS as a shield to protect Honeywell from its own egregious acts or other conduct intended to benefit Honeywell at a cost to the public. To the contrary, from its inception, HIS had a legitimate business purpose, was adequately funded, and operated as a self-sufficient corporate entity. The Yoders have failed to meet their burden to present genuine issues of material fact that Honeywell was the "alter ego" of HIS and, therefore, liable for the acts of HIS's successor Bull.

In the alternative, the Yoders claim that Honeywell is liable for Ms. Yoders' injuries because its trademark appears on the keyboard. Under § 400 of the Restatement (Second) of Torts, the Yoders assert that Honeywell is liable as the apparent manufacturer of the keyboard. Section 400 is entitled "Selling as Own Product Chattel Made by Another." This section imposes liability on "one who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." The Yoders argue that where, as here, a corporation licenses another entity to use its trademark, the corporation is liable for injuries caused by that product because it has held itself out as the manufacturer of the product.

The Yoders cite *Brandimarti v. Caterpillar Tractor Co.*, 364 Pa.Super. 26, 527 A.2d 134 (1987), and *Connelly v. Uniroyal, Inc.*, 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979), in support of their contention that a corporation which permits a manufacturer or seller to use the corporate trademark on a product is liable for injuries caused by that product regardless whether the corporation did not itself manufacture, sell or distribute the product. In *Caterpillar*, the Pennsylvania Superior Court reversed the district court's grant of a directed verdict in favor of the defendant Caterpillar. There, plaintiff sought damages for injuries sustained when the forklift he was operating overturned. The court held that although Caterpillar was not a supplier or manufacturer of the product, because its name appeared on the equipment, others relied on the skill and reputation of the Caterpillar name when purchasing the product. Thus, the court rationalized that Caterpillar should be held to the same duty as the seller. *Id.* 527 A.2d at 138–39. The case was remanded to the trial court for determination of Caterpillar's liability.

In *Connelly*, the plaintiff was injured by a tire bearing the defendant's trademark. The defendant had not manufactured or sold the tire. The Supreme Court of Illinois found that the apparent manufacturer doctrine applied because the parent corporation provided its subsidiary with the plans, specifications, and technical knowledge necessary to

produce the tires, authorized the use of its trademark and received quarterly payments from its subsidiary. *Id.* 27 Ill.Dec. at 350–51, 389 N.E.2d at 162–63; *Hebel v. Sherman Equipment*, 92 Ill.2d 368, 65 Ill.Dec. 888, 893, 442 N.E.2d 199, 204 (1982).

Neither of these cases apply Colorado law. Moreover, both are distinguishable. Contrary to the facts in *Caterpillar*, the Honeywell label is located inconspicuously on the bottom of the keyboard. There is no evidence that the purchaser of the keyboard or Ms. Yoder relied on the skill and reputation of Honeywell when purchasing or using the keyboard. Unlike the parent company in *Connelly*, Honeywell did not exercise any control over the manufacturing process of the keyboard at issue. Although the licensing agreement requires HIS to comply with Honeywell's quality control standards, the agreement did not require HIS to follow plans or product specifications, nor did it provide for Honeywell to be involved in the manufacturing process. In contrast with the evidence in *Connelly*, the Yoders proffer no evidence that Honeywell was in a position to eliminate the allegedly unsafe characteristics of the keyboard. Furthermore, a majority of the courts have rejected the theory that products liability should extend to corporations which have allowed their trademark to be used on a product which they did not manufacture, sell, or distribute. *Nelson v. International Paint Co.*, 734 F.2d 1084, 1088–1089 (5th Cir.1984); *Affiliated FM Insurance Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir.1987); *Torres v. Goodyear Tire & Rubber Co., Inc.*, 867 F.2d 1234, 1236–37 (9th Cir.1989); *Fletcher v. Atex, Inc.*, 861 F.Supp. 242, 245–46 (S.D.N.Y.1994); *Seasword v. Hilti, Inc.*, 449 Mich. 542, 537 N.W.2d 221, (1995).

There are no cases in Colorado which have adopted or rejected the Restatement (Second) of Torts § 400. Under Colorado statutory law, product liability is imposed on a "manufacturer" of the product. C.R.S. § 13–21–401. Section 13–21–401 defines manufacturer to include:

[A] person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a compo-

nent part of a product prior to the sale of the product to a user or consumer. The term includes any seller who has actual knowledge of a defect in a product or a seller of a product who creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product or who otherwise exercises some significant control over all or a portion of the manufacturing process or who alters or modifies a product in any significant manner after the product comes into his possession and before it is sold to the ultimate user or consumer. The term also includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer. A seller not otherwise a manufacturer shall not be deemed to be a manufacturer merely because he places or has placed a private label on a product if he did not otherwise specify how the product shall be produced or controlled, in some significant manner, the manufacturing process of the product and the seller discloses who the actual manufacturer is.

The definition of manufacturer is both extensive and explicit. The intent of this section is to extend liability to those entities involved in the production of the product or otherwise in control the production process. The Yoders proffer no evidence that Honeywell manufactured, sold or distributed the product, provided specifications for the production of the product, or exercised significant control over the production of the product. The final sentence of § 13–21–401 manifests the Colorado General Assembly's intent that where, as here, the corporation provides the trademark but has no role in the manufacturing process or the sale of the product, liability for injuries caused by the product will not be imputed to that corporation. The Yoders cite no authority in support of their assertion that "given the liberal approach Colorado has taken toward products liability law, it is reasonable to conclude that Colorado would adopt the Restatement provision if the opportunity arose." Accordingly, I conclude that, as a matter of law, Honeywell is not a manufacturer under § 13–21–401. Consequently, I grant the motion for summary judgment.

## IV.

■ For purposes of a motion to dismiss, I accept all factual allegations as true and resolve all reasonable inferences in favor of the plaintiffs. *Tri–Crown, Inc. v. American Federal Sav. & Loan Ass'n*, 908 F.2d 578, 582 (10th Cir.1990). A case should not be dismissed for failure to state a claim unless I determine beyond doubt that the plaintiffs can prove no set of facts which entitle them to relief. *Id.*

## V.

■ There is no dispute that Colorado law governs resolution of the motion to dismiss. Under Colorado law, an action against a manufacturer of a product "shall be brought within two years after the claim for relief arises and not thereafter." C.R.S. § 13–80–106. "A cause of action for injury ... shall be considered to accrue on the date both the *injury and its cause* are known or should have been known by the exercise of reasonable diligence." C.R.S. § 13–80–108 (emphasis added). Bull contends that at the latest, Ms. Yoder was aware of her injury and the cause of her injury on December 28, 1992, the date she filed her complaint. The amended complaint was filed March 15, 1995, more than two years later. Thus, Bull argues that her claim is barred under § 13–80–106.

The Yoders counter that under *Callaham v. First American Title Ins. Co.*, 837 P.2d 769 (Colo.App.1992), their cause of action against Bull did not accrue until they knew it was Bull's product which caused their injuries. In *Callaham* the parties disagreed as to the applicable statute of limitations. The plaintiff argued that because the defendant's negligent conduct occurred before July 1, 1986, the six year statute of limitation was applicable to their cause of action. The Colorado Court of Appeals disagreed holding that "the critical factor by which to determine the applicable limitations period is when the plaintiffs had a claim to assert. * * * This limitations period does not begin to run until a plaintiff discovers, or in the exercise of

reasonable diligence should have discovered, the existence of facts forming the basis of a claim for relief." *Id.* at 771. At trial the jury determined that the plaintiffs' cause of action accrued on July 1, 1987, when they discovered or should have discovered the loss, damage or conduct giving rise to the injury. Therefore, the court held that the two year statute of limitations applied and barred the plaintiffs' action.

The Yoders rely on the court's statement in *Callaham* that "[a]lthough defendant's conduct which ultimately gave rise to plaintiffs claims occurred in 1985, there was no claim in existence prior to the time that plaintiffs discovered, not only the conduct or acts of defendant, but also discovered their injuries and that *defendant's conduct was a cause thereof.*" *Id.* at 771–72. (emphasis supplied). The Yoder's reliance on this language, however, is misplaced. The court was simply emphasizing the fact that the plaintiffs' cause of action could not accrue until they knew they had sustained injuries caused by the wrongful act of another. *See Mastro v. Brodie*, 682 P.2d 1162, 1168 (Colo.1984). The identity of the defendant was not at issue.

Bull correctly asserts that the statute of limitations begins to run when the injury and its cause are known. This is consistent with the language of the statute and the Colorado Supreme Court's holding in *Jones·v. Cox*, 828 P.2d 218 (Colo.1992) where the court held that "the statute of limitations begins to run from the date the physical injury and its cause were known or should have been known by the exercise of reasonable diligence." *Id.* at 220. The Colorado Court of Appeals addressed the issue of when a cause of action accrues where the identity of the defendant is not readily ascertainable in *Grogan v. Taylor*, 877 P.2d 1374 (Colo.App.1993). At trial the court instructed the jury that:

> [The plaintiff's] [ ] claims against the defendant [ ] are deemed to accrue on the date both his physical injuries and their cause were known or should have been known to him or his attorneys by the exercise of reasonable diligence. However, it is not necessary for the defendant to prove that [the plaintiff] [ ] or his attorneys

knew the specific acts of the alleged negligence by this defendant or others or that they knew the details of the facts necessary to prove the claims against this defendant or others. It is enough that the plaintiff or his attorneys knew, or may be reasonably charged with knowledge of, sufficient facts to be aware that a claim existed more than two years before it was filed. Id. at 1379.

The court held that the instruction properly embodied defendant's theory that the plaintiff's attorneys did not use reasonable diligence. Under Colorado law, therefore, the relevant inquiry is when the Yoders knew or should have known that Ms. Yoder's injuries were caused by her use of the keyboard.

The face of the complaint shows that Ms. Yoder knew her injuries were caused by her use of a keyboard on December 28, 1992. On January 23, 1993, Honeywell filed its answer denying that it manufactured the keyboard at issue. Honeywell's Answer, ¶ 10. At a Scheduling/Planning conference held August 17, 1994 Honeywell raised the issue of product identification. On December 7, 1994 representatives of plaintiff and Honeywell inspected the subject keyboards at the United Airlines Reservation Center in Denver, Colorado. The Yoders proffer no explanation why they did not inspect the keyboards at an earlier date or make other reasonable efforts to discover or confirm the identity of the manufacturer after filing the complaint and in light of Honeywell's answer denying that it manufactured the keyboard.

"The purpose of the statute of limitations is to promote justice, discourage unnecessary delay and forestall prosecution of stale claims." *Id.* at 224. As a matter of law, Ms. Yoder's cause of action accrued at the latest on December 28, 1992 when she knew she was injured and knew the cause of her injury. According to the plain intent of the Colorado General Assembly, the Yoders then had two years to discover the keyboard manufacturer with reasonable diligence. No circumstances are shown here to give rise to any equitable tolling of the statute. Where, as here, the identity of the defendant could be discovered through reasonable diligence the action is properly barred if not filed

within the two year limitation period. Because Mr. Yoder's loss of consortium claim is derivative in nature, it is also barred. *Covert v. Allen Group, Inc.,* 597 F.Supp. 1268, 1270 (D.Colo.1984). Consequently, I grant the motion to dismiss.

Accordingly it is ORDERED that:

(1) Defendant Honeywell's motion for summary judgment is GRANTED; and

(2) Defendant Bull's motion to dismiss is GRANTED.

(3) This action is DISMISSED with costs awarded to defendants.