2014 UT App 177

**Jamie McQUIVEY, Plaintiff and Appellant,**

v.

**FULMER HELMETS, INC., Defendant and Appellee.**

No. 20121056–CA.

Court of Appeals of Utah.

July 31, 2014.

Mark R. Taylor, Henry N. Didier Jr., and P. Alexander Gillen, for Appellant.

Julianne P. Blanch and Tsutomu L. Johnson, Salt Lake City, for Appellee.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judge JOHN A. PEARCE concurred. Judge JAMES Z. DAVIS concurred in the result.

## Opinion

VOROS, Judge:

¶ 1 Eight-year-old Conway Cook crashed an all-terrain vehicle while wearing a protective helmet. Instead of protecting him, the helmet cracked and injured his face. Conway's mother sued various defendants on his behalf. The district court dismissed the claim against Fulmer Helmets, Inc. under the passive-retailer doctrine. We reverse and remand for further proceedings.

## BACKGROUND [1]

¶ 2 In 2008, Conway Cook drove his ATV down a dirt path, trailing his grandfather's truck. Conway wore a Fulmer Blade AF–C1, a helmet designed for children. While driving along the path, Conway hit a shallow ditch. The impact ejected Conway and flipped the ATV. The helmet's chinguard snapped on impact, and the sharp edge of the now-serrated plastic guard cut deeply into Conway's face. His injuries were serious and will require lifelong care and future surgeries.

¶ 3 On Conway's behalf, his mother, Jamie McQuivey, sued three parties: Kim Yong Lung Industrial (KYL), which manufactured the helmet in Taiwan; Fulmer Helmets, which distributed the helmet throughout the American market; and White Knuckle Motor Sports, which sold the helmet to Conway's father. Against Fulmer, McQuivey alleged strict liability for defective design as well as negligence and failure to warn.

¶ 4 The district court dismissed McQuivey's claims against both KYL and White Knuckle. McQuivey stipulated to White Knuckle's dismissal because the evidence showed that White Knuckle had neither knowledge of potential defects nor influence over the helmet's design, safety, or manufacturing. KYL moved to dismiss the claims against it for lack of personal jurisdiction. Fulmer and McQuivey did not oppose the motion, and the district court granted it, leaving Fulmer as the lone defendant.

¶ 5 Fulmer moved for summary judgment. Fulmer argued that, as a passive retailer, it could not be held liable for defects in the helmet. The district court agreed and dismissed all claims against Fulmer, terminating the litigation.

## ISSUE AND STANDARD OF REVIEW

¶ 6 McQuivey contends that the district court erred in granting summary judgment for Fulmer on the ground that it qualifies as a passive retailer. We review a

1. When reviewing a district court's rulings on a summary judgment motion, we recite all facts and fair inferences in the light most favorable to the nonmoving party. *Poteet v. White*, 2006 UT 63, ¶ 7, 147 P.3d 439.

district court's "legal conclusions and ultimate grant or denial of summary judgment for correctness ... and view[ ] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson,* 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted). Furthermore, "[t]he determination of whether a passive seller of a product can be held strictly liable under the Utah Liability Reform Act ... is based on the trial court's interpretation of a statute, which we review for correctness without deference to the trial court's conclusions." *Yirak v. Dan's Super Mkts., Inc.,* 2008 UT App 210, ¶ 3, 188 P.3d 487 (citation and internal quotation marks omitted).

## ANALYSIS

¶ 7 McQuivey contends that the district court improperly applied the passive-retailer doctrine to Fulmer and thus erred in dismissing Fulmer from the case. She argues that Fulmer does not qualify as a passive retailer because "[Fulmer] is not passive in the design, manufacturing, and testing of the helmets bearing its name." Fulmer responds that it qualifies as a passive retailer because it "does not design or manufacture helmets."

■■■ ¶ 8 Under general principles of tort law, "as between an injured buyer of a product, and the seller of the product, the seller must bear the liability." *Sanns v. Butterfield Ford,* 2004 UT App 203, ¶ 15, 94 P.3d 301. Utah has long recognized a cause of action against the seller of defective products. *Hahn v. Armco Steel Co.,* 601 P.2d 152, 158 (Utah 1979). Under Utah's Product Liability Act, a "manufacturer or other initial seller" who sells an "unreasonably dangerous product" may be liable for resulting "personal injury, death, or property damage." Utah Code Ann. § 78B–6–703(1) (LexisNexis 2008). And under the Second Restatement of Torts, section 402A, the commercial seller of a defective product may be held strictly

liable—liable without proof of fault—for harm caused by the product:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A (1965) *expressly adopted in Hahn,* 601 P.2d at 158. Thus, because "strict liability does not require an examination of a party's fault," a manufacturer or other initial seller can be held liable for a defective product regardless of its degree of fault. *Sanns,* 2004 UT App 203, ¶ 14 n. 5, 94 P.3d 301. However, these rules exist in tension with another feature of Utah tort law: comparative fault.

■■■ ¶ 9 Comparative fault became the law of Utah in 1986. Before that time, Utah applied the common-law rule of joint-and-several liability. Under joint-and-several liability, "a tortfeasor was potentially liable for the entire amount of a plaintiff's damages, irrespective of what proportion of fault was actually attributable to that individual tortfeasor as opposed to another joint tortfeasor." *National Serv. Indus. v. B.W. Norton Mfg. Co.,* 937 P.2d 551, 554 (Utah Ct.App. 1997). In 1986, the Utah Legislature enacted the Liability Reform Act. *See* Utah Code Ann. § 78B–5–820(1) (LexisNexis 2008). The Act replaced the rule of joint-and-several tort liability with a rule of comparative fault. A plaintiff's "recovery of damages under the Product Liability Act is proportionate to the percentage of fault attributable to each defendant." *Yirak,* 2008 UT App 210, ¶ 4, 188 P.3d 487. The Act defines "fault" to include strict liability. Utah Code Ann. § 78B–5–817(2) (LexisNexis 2008). Consequently, a plaintiff in a products-liability case may recover from each defendant only in proportion to that defendant's fault (including strict liability).[2]

---

**2.** We previously noted that the legislature's "inclusion of 'strict liability' in defining 'fault' is confusing and somewhat problematic because

unlike negligence, strict liability does not require an examination of a party's fault." *Sanns v. Butterfield Ford,* 2004 UT App 203, ¶ 14 n. 5, 94

¶ 10 Tension inheres between the principles of Utah's comparative-fault statute and Utah's products-liability statute because together they require a finder of fact to apportion relative fault to a codefendant whose liability does not depend on fault as commonly understood in tort law. In response to this tension, this court devised the passive-retailer doctrine.

¶ 11 The passive-retailer doctrine creates an exception to strict liability under the Product Liability Act for "passive retailers"—sellers who do not "participate in the design, manufacture, engineering, testing, or assembly" of a product. *Sanns*, 2004 UT App 203, ¶ 21, 94 P.3d 301. Under this doctrine, "a passive retailer is not subject to a strict liability claim ... where the manufacturer is a named party to the action." *Yirak v. Dan's Super Mkts. Inc.*, 2008 UT App 210, ¶ 5, 188 P.3d 487. The passive-retailer doctrine thus allows the trial court to dismiss a strict-liability claim against a codefendant when undisputed facts establish that no fact finder could, under principles of comparative fault, apportion fault to that codefendant. In this circumstance, "as long as [the actual manufacturer] is present in the suit, there remains no reason to require [a passive retailer] to incur the time and expense of de-

fending" the action. *Sanns*, 2004 UT App 203, ¶ 21, 94 P.3d 301.[3]

¶ 12 This court has applied the passive-retailer doctrine only twice.[4] In *Sanns*, a van in which Sanns was a passenger rolled several times. *Id.* ¶ 2. Sanns sued both the manufacturer—Ford Motor Company—and the retailer—Butterfield Ford. *Id.* ¶ 3. We held that Butterfield Ford qualified as a passive retailer because it "did not participate in the design, manufacture, engineering, testing, or assembly of the van." *Id.* ¶ 21. As a result, we concluded, "The strict liability 'fault' in this case, if any, lies with the manufacturer, not with Butterfield Ford, the passive retailer." *Id.* Consequently, we held that "the trial court was correct to dismiss Butterfield Ford." *Id.*

¶ 13 This court again applied the passive-retailer doctrine in *Yirak*, 2008 UT App 210, 188 P.3d 487. After discovering a piece of glass in her prepackaged salad, Yirak sued both the seller—Dan's Super Markets—and the manufacturer—Dole. *Id.* ¶¶ 2, 5 n. 3. However, Dan's submitted undisputed evidence that it did not "manufacture, design, repackage, label, or inspect the prepackaged salads supplied by Dole." *Id.* ¶ 7. Conse-

P.3d 301. "The use of strict liability in this statutory definition should be viewed only as a cause of action subject to the [Liability Reform Act], rather than changing the traditional use of the term fault to somehow include strict liability, a liability concept that is unconcerned with fault in the usual sense of culpability." *Id.*

3. Other jurisdictions have sought to protect passive sellers from the effects of section 402A in other ways or left them unprotected. Some jurisdictions that adopted section 402A sought to protect passive sellers with legislation prohibiting a strict-liability suit against a seller unless the seller either manufactures the product or participates in the manufacture of the product. *See, e.g.,* Ga.Code Ann. § 51–1–11.1 (2000); Ind.Code § 34–20–2–3 (2008); Neb.Rev.Stat. § 25–21,181 (2008). Other jurisdictions have enacted legislation prohibiting strict-liability suits against passive sellers unless no remedy exists against the manufacturer. *See, e.g.,* Del.Code Ann. tit. 18, § 7001 (1999); Idaho Code § 6–1407(4) (2010); Iowa Code § 613.18 (West 1999); Kan. Stat. Ann. § 60–3306 (Supp.2012); Ky.Rev.Stat. Ann. § 411.340 (LexisNexis 2005); Md.Code Ann., Cts. & Jud. Proc. § 5–405 (LexisNexis 2013); Minn.Stat. Ann. § 544.41 (West 2010); Mo. Ann. Stat. § 537.762 (West 2008); N.C. Gen.

Stat. Ann. § 99B–2 (2013); N.D. Cent.Code § 28–01.3–04 (2006); Tenn.Code Ann. § 29–28–106 (Supp.2013); Wash. Rev.Code Ann. § 7.72.040(2) (West 2007). And a significant number of jurisdictions that adopted section 402A have not enacted any legislation to protect passive sellers and continue to subject passive sellers to strict liability. *See, e.g., Clark v. Williamson*, 129 F.Supp.2d 956, 959 (S.D.Miss. 2000) (applying Mississippi law and holding that a passive retailer could be strictly liable in products-liability suit); *Oser v. Wal–Mart Stores, Inc.*, 951 F.Supp. 115, 119 (S.D.Tex.1996) (holding that a plaintiff injured by a defective shopping bag can sue the passive retailer); *Nichols v. Agway, Inc.*, 280 A.D.2d 889, 720 N.Y.S.2d 691, 692 (1994) (confirming that retailers are subject to strict-liability suits but dismissing on other grounds); *Honeywell v. GADA Builders, Inc.*, 271 P.3d 88, 95 (Okla.Civ.App.2011) ("The rationale for imposing strict liability on retailers and distributors is founded upon the public interests in human safety...").

4. The Utah Supreme Court has yet to address or apply the passive-retailer doctrine.

quently, we held that Dan's qualified as a passive retailer. *Id.* ¶ 8.

¶ 14 Notably, the passive retailers in *Sanns* and *Yirak* did not participate in the creation of the defective or unreasonably dangerous products at issue in those cases—they did not participate in the products' design, manufacture, or testing. *See Sanns v. Butterfield Ford,* 2004 UT App 203, ¶ 21, 94 P.3d 301; *Yirak,* 2008 UT App 210, ¶ 7, 188 P.3d 487. They were thus not "in a position to eliminate the unsafe character of the product and prevent the loss," one of the rationales for imposing strict liability. *See Hebel v. Sherman Equip.,* 92 Ill.2d 368, 65 Ill.Dec. 888, 442 N.E.2d 199, 205 (1982).

¶ 15 In contrast, McQuivey presented evidence demonstrating that Fulmer did participate in the manufacture, design, and testing of the helmets that bear its name. First, Fulmer participates in helmet design. Fulmer receives sample helmets from KYL to ensure that they fit properly. One of Fulmer's representatives stated, "[W]e might have to tell [KYL] this is tight here or loose here and they change something about the comfort padding perhaps to—to adjust the way it fits. But we work through that." Fulmer also designs the helmets' graphics and tags.[5] Though relatively slight, this degree of involvement in helmet design distinguishes Fulmer from Dan's and Butterfield Ford, who had no role in the design of the products they sold.

¶ 16 Fulmer also participates in the helmets' manufacture. Fulmer performs on-site visits to KYL's helmet factory twice annually. Fulmer examines KYL's quality-control procedures. Furthermore, Fulmer requires that KYL manufacture its helmets in compliance with United States Department of Transportation standards, "100 percent, every helmet, all the time." This level of involvement constitutes "participation" in the manufacturing process. *See Sanns,* 2004 UT App 203, ¶ 21, 94 P.3d 301.

¶ 17 Fulmer also participates in the helmets' testing. Fulmer requires that KYL test all Fulmer helmets, and Fulmer itself has the helmets tested "from time to time." As mentioned above, Fulmer test-fits helmets and then instructs KYL to make changes accordingly. Furthermore, Fulmer has had helmets tested "both in KYL as well as in labs in the United States" to ensure that all helmets comply with U.S. standards.

¶ 18 Finally, we note that Fulmer holds itself out to the public as the manufacturer of the helmets that bear its name. Under Second Restatement of Torts, "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400 (1965). "[O]ne puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark." *Id.,* § 400 cmt. d. Courts typically refer to this as the "apparent-manufacturer doctrine." *Long v. United States Brass Corp.,* 333 F.Supp.2d 999, 1002 (D.Colo.2004) (citing *Yoder v. Honeywell Inc.,* 104 F.3d 1215, 1223 (10th Cir.1997)). "The primary rationale for imposing liability on the apparent manufacturer of a defective product is that it induced the purchasing public to believe that it is the actual manufacturer, and ... [thus] to purchase the product in reliance on the apparent manufacturer's reputation and skill in making it." *Hebel,* 65 Ill.Dec. 888, 442 N.E.2d at 203 (emphasis omitted). Although Utah has not yet addressed the question, most jurisdictions to consider the apparent-manufacturer doctrine have adopted it.[6]

---

5. Fulmer's tags contain explicit warnings, instructions for sizing, and a directive stating, "If helmet experiences a severe blow, return it to the manufacturer for competent inspection or destroy and replace it." Below this direction, in all capital letters, the tag reads, "FULMER HELMETS, INC."

6. *See, e.g., Carney v. Sears, Roebuck & Co.,* 309 F.2d 300, 304 (4th Cir.1962) (citing *Highland Pharmacy, Inc. v. White,* 144 Va. 106, 131 S.E. 198 (1926)); *Davis v. United States Gauge,* 844 F.Supp. 1443, 1446 (D.Kan.1994); *Moody v. Sears, Roebuck & Co.,* 324 F.Supp. 844, 846 (S.D.Ga.1971) *superseded by statute as stated in Freeman v. United Cities Propane Gas, Inc.,* 807 F.Supp. 1533, 1539–40 (M.D.Ga.1992); *Sears, Roebuck & Co. v. Morris,* 273 Ala. 218, 136 So.2d 883, 885 (1961); *Cravens, Dargan & Co. v. Pacific Indem. Co.,* 29 Cal.App.3d 594, 105 Cal.Rptr. 607, 611 (1972); *King v. Douglas Aircraft Co.,* 159 So.2d 108, 110 (Fla.Dist.Ct.App.1963); *Dudley Sports Co. v. Schmitt,* 151 Ind.App. 217, 279

¶ 19 As McQuivey has not urged us to adopt the apparent-manufacturer doctrine here, we reserve that question for another day. We note, however, that Fulmer distributed the Blade AF–C1 helmet under its own name; typically describes itself as the "manufacturer" of Fulmer helmets on equipment safety reports filed with the National Highway Traffic Safety Administration; and puts its name on tags inside its helmets, certifying that they meet the applicable safety standards.

¶ 20 Even without resort to the apparent-manufacturer doctrine, we conclude that the district court erred in granting summary judgment for Fulmer as a passive retailer. *See Sanns*, 2004 UT App 203, ¶ 21, 94 P.3d 301. Although KYL principally conducted the manufacturing, design, and testing of the helmets, the passive-retailer doctrine does not ask whose role in manufacturing a defective product was the greatest; rather it asks whether a party "participate[d] in the design, manufacture, engineering, testing, or assembly of" the product. *Id.* This follows from the passive-retailer doctrine's rationale, which is to dismiss codefendants to whom the finder of fact will, should the matter go to trial, inevitably apportion no fault.[7]

### CONCLUSION

¶ 21 We reverse the district court's judgment of dismissal and remand the case for further proceedings.

N.E.2d 266, 273 (1972); *Tice v. Wilmington Chem. Corp.*, 259 Iowa 27, 141 N.W.2d 616, 628 (Iowa 1966); *Penn v. Inferno Mfg. Corp.*, 199 So.2d 210, 215 (La.Ct.App.1967); *Coca Cola Bottling Co. v. Reeves*, 486 So.2d 374, 378 (Miss. 1986) *superseded by statute as stated in Turnage v. Ford Motor Co.*, 260 F.Supp.2d 722, 727 (S.D.Ind.2003); *Slavin v. Francis H. Leggett & Co.*, 114 N.J.L. 421, 177 A. 120, 121 (N.J.1935) *aff'd*, 117 N.J.L. 101, 186 A. 832 (N.J.1936); *Andujar v. Sears Roebuck & Co.*, 193 A.D.2d 415, 597 N.Y.S.2d 78, 78 (1993) (citing *Commissioners of State Ins. Fund v. City Chem. Corp.*, 290 N.Y. 64, 48 N.E.2d 262, 265 (1943)); *Warzynski v. Empire Comfort Sys., Inc.*, 102 N.C.App. 222, 401 S.E.2d 801, 803–04 (1991); *Forry v. Gulf Oil Corp.*, 428 Pa. 334, 237 A.2d 593, 599 (1968); *Sears, Roebuck & Co. v. Black*, 708 S.W.2d 925, 928 (Tex.App.1986); *Wojciuk v. United States Rubber Co.*, 13 Wis.2d 173, 108 N.W.2d 149, 152–53 (1961).

7.  McQuivey also argues that the court erred in granting summary judgment in Fulmer's favor on two other grounds: first, that "the passive-retailer doctrine is inappropriate" here because "the alleged manufacturer was never a proper party to this case," and second, that "even if the doctrine otherwise applied, only the strict-liability claims against Fulmer should be dismissed." Because we determine that the court erred in ruling that Fulmer qualifies as a passive retailer, we do not address these arguments.